## FRIEDMAN, Appellant, v. PULITZER PUBLISHING COMPANY, Respondent.

### St. Louis Court of Appeals, December 1, 1903.

1. **Libel**: EXEMPLARY DAMAGES: MITIGATING CIRCUMSTANCES. In an action for libel, where exemplary damages are claimed, any facts tending to disprove malice, are admissible in evidence for the purpose of mitigation, and the alleged libeler may testify that he bore no ill will toward the plaintiff.

2. ——: ——: PLEADINGS: EVIDENCE: SPECIAL DAMAGES. In an action for libel, it is error to permit plaintiff to prove damages from loss of business of other special damages unless the same are specially pleaded.

3. ——: ——: INSTRUCTIONS: APOLOGY FOR LIBEL. In an action for libel it is error to instruct the jury that they may take into consideration the absence of an apology for the alleged libel in estimating the damage, in the absence of any evidence as to whether an apology was asked for or declined.

4. **Practice**: SETTING ASIDE VERDICT: DUTY OF TRIAL COURT. It is the prerogative and special duty of the trial court to grant a new trial when the verdict is deemed arbitrary or manifestly wrong, or appears to be the result of passion or prejudice on the part of the jury, and, unless it is manifest that the trial court has abused its discretion in such a case. its ruling will not be disturbed by the appellate court.

Appeal from St. Louis City Circuit Court.—*Hon. H. D. Wood,* Judge.

AFFIRMED.

*Thos. B. Harvey* for appellant.

(1)   No error was committed in the admission of evidence in behalf of appellant over the objection of respondent; nor in the rejection of evidence offered by respondent and objected to by appellant.   Ford v. Railroad, 63 Mo. App. 133; Walton v. Railroad, 40 Mo. App. 544; Koons v. Railroad, 65 Mo. 592; King v. Railroad, 98 Mo. 235; Gregory v. Chambers, 78 Mo. 294; Railroad v. Union Stock Yards, 120 Mo. 541; Riley v. Sherwood, 144 Mo. 354.   (2)   The well-established law is that where the language is actionable *per se,* and especially if it relates to a man's business or occupation, recovery may be had for loss or falling off of business, as general damages; and likewise for probable future losses resulting from the defamation, and general damages need not be specially pleaded or proved.   Hermann v. Bradstreet, 19 Mo. App. 227; Mitchell v. Bradstreet, 116 Mo. 226; Bergmann v. Jones, 94 N. Y. 51; Bradstreet Co. v. Gill, 72 Tex. 115; Orth v. Featherly, 87 Mich. 315; Taylor v. Hearst, 118 Cal. 366; Childers v. Printing Company, 105 Cal. 284; Chesley v. Thompson, 137 Mass. 136; Cribbs v. Yore, 119 Mich. 237; 18 Am. and Eng. Ency. Law (2 Ed.), p. 1085.   (3)   The verdict in libel or slander will not be disturbed on the ground of excessive amount unless it is so great as to shock the moral sense and raise the presumption that the jury was actuated by passion, bias or prejudice.   Hirsch v. Grand Lodge, 78 Mo. App. 358; Manget v. O'Neill, 51 Mo. App. 35; Hollenbeck v. Railroad, 141 Mo. 97; Dammann v. St. Louis, 152 Mo. 186.   (4)   For the amount of damages to be assessed in actions of libel and slander, is peculiarly within the province of the jury.   Arnold v.

Sayings Co., 76 Mo. App. 184; Gibson v. Enquirer Co., Fed. Cas. No. 5392; Smith v. Sun Pub. Co., 50 Fed. 399. (5) We cite the following as a few of the many cases in which verdicts ranging from $3,000 to$7,000 have been held not to be excessive, and the publications were not more defamatory nor the injury greater, than in the case at bar. Letton v. Young, 59 Ky. 558; Gibson v. Enquirer, Fed. Cas. 5392; Smith v. Sun Co., 50 Fed. 399; Buckley v. Knapp, 48 Mo. 152; Ogden v. Gibbons, 5 N. J. Law 518; Alliger v. Daily Eagle, 53 Hun 633; Hartman v. Morning Journal, 19 N. Y. Supp. 398. (6) We therefore respectfully insist that no error was committed in the admission of evidence and that the verdict was not excessive—the two grounds on which the trial court based its order granting a new trial; and that therefore said order was an "erroneous exercise of judicial discretion" which will be reviewed and corrected by an appellate court, as held in Roberts v. Railroad, 56 Mo. App. 60; Carr v. Moss, 87 Mo. 447; Judah v. Hogan, 67 Mo. 252; Walton v. Walton, 19 Mo. 667; In re Wilson, 95 Mo. 184; Carr v. Dawes, 46 Mo. App. 598. For the very reason that respondent states that "no evidence was offered that one [an apology] was made," the trial court was warranted in giving this instruction. Every defamatory publication prima facie implies malice. Sullivan v. Strahorn-Hutton-Evans Com. Co., 152 Mo. 168; Jones v. Murray, 167 Mo. 25. (7) And, "In those cases in which malice is presumed, it is, of course, unnecessary for the plaintiff or the prosecution to introduce any evidence of malice other than may be inferred from the publication or utterance of the defamatory words, and the burden of proof is upon the defendant to show the absence of malice if he relies upon that for justification." 18 Am. and Eng. Ency. of Law (2 Ed.), p. 1003, citing; Dixon v. Stewart, 33 Iowa 125; Courier-Journal Company v. Sallee, 47 S. W. 226; Sibley v. Lay, 44 La. Ann. 936; Usher v. Severance, 20

Me. 9; Lewis v. Few, 5 Johns. (N. Y.) 1; State v. Mason, 26 Oregon 273; Com. v. Swallow, 8 Pa. Sup. Ct. 534.

*Judson & Green* for respondent.

(1) The ruling of the court below that the verdict was so excessive, both as to compensatory and punitive damages, as to indicate passion and prejudice on the part of the jury, falls under the repeated decisions of the Supreme Court and of this court that such a ruling is so clearly within the province of the trial court that the exercise of this discretion will not be interfered with except in rare cases. This is especially the case where the trial court has granted a new trial, as there the parties have another day in court. Enson v. Smith, 57 Mo. App. 584; Powell v. Railroad, 59 Mo. App. 535; Chouquette v. Railway, 152 Mo. 257; Burdict v. Railroad, 123 Mo. 221; Reid v. Ins. Co., 58 Mo. 421; Price v. Evans, 49 Mo. 396; Lockwood v. Ins. Co., 47 Mo. 50; Woolfolk v. Tate, 25 Mo. 597; Lee v. George Knapp & Co., 137 Mo. 385; Parker v. Cassingham, 130 Mo. 348; Bank v. Wood, 124 Mo. 72; Kuenzel v. Stevens, 155 Mo. 280; McCloskey v. Publishing Co., 163 Mo. 22. (2) While the foregoing point is conclusive, it is also clear that the court erred in refusing to permit defendant's servant, the reporter who wrote the alleged libelous article, to testify whether or not he had any malice toward the plaintiff. The plaintiff claimed malice and claimed and recovered punitive damages, and the evidence was admissible, therefore, if on no other ground, in mitigation or such punitive damages. The law on this subject is clearly settled in this State. Callahan v. Ingram, 122 Mo. 373; Lewis v. Humphreys, 64 Mo. App. 466. (3) Wherever evidence of the motive or intent with which a thing is done is relevant, the direct testimony of the actor is admissible of such motive or intent. State v. Mason, 24 Mo. App. 321. Anything which tends to disprove malice is admissible in mitigation. Lewis v. Humphreys,

64 Mo. 473; Weaver v. Hendrick, 30 Mo. 502.    (4)   If McCammon had written the article with express malice against the plaintiff, clearly that fact could have been established by the plaintiff, and such malice would have been imputed to the defendant.    Bulkley v. Knapp, 48 Mo. 152; Hall v. Railway, 119 Mo. 325; Graham v. Railway, 66 Mo. 541; Johnston v. St. Louis Dispatch, 2 Mo. App. 565, affirmed in 65 Mo. 539.    It necessarily follows that defendant had the right to show good faith by disproving express malice on the part of its reporter.    Epperson v. Cramer, 54 Wis. 220.    (5)   There was obvious error in the admission of testimony of special damage, for which no foundation was laid in the petition:   First, in the admission of evidence of the suspension from the Ticket Brokers' Association, there being no allegation thereof in the petition, and it being in no sense natural and probable damages of which defendant could have been advised in preparing for trial.    Second, in admitting evidence of plaintiff's estimate of his loss of business earnings, no foundation being laid therefore in the petition, and there being no allegation in the petition that he was even a ticket broker.    Stiebeling v. Lockhaus, 28 Sup. Ct. Rep. N. Y. 457; Starkie, Slander and Libel, chap. 21, p. 493; Tomlinson v. Derby, 43 Conn. 562; Holt v. Evening News, 94 Mich. 119; Shipman v. Burrows, 1 Hall (Sup. Ct. N. Y.), 399; Nelson v. Runnyon, Wright's Ohio Rep. 651; McDuff v. Detroit Even. Journal, 84 Mich. 1.    (6)   In an action for libel where complaint contains no allegation of special damage, it is error to permit witness to state his opinion as to amount of damage plaintiff has sustained.    Bostwick v. Nickelson, Kirby (Conn.) 65; Bostwick v. Hawley, Kirby (Conn.) 290; Shipman v. Burrows, 1 Hall (Supr. Ct. N. Y. City) 399; Nelson v. Runnyon, Wright (Ohio) 651.    (7)   There was no evidence whatever of the absence of any apology, and while it is true no evidence was offered that one was made, there is no evidence that an apology was ever asked for.    Hewitt v. Steele, 118

Mo. 463; Kansas & Texas Coal Co. v. Millett, 50 Mo. App. 382; Goltz v. Griswold, 113 Mo. 144; Mateer v. Railroad, 105 Mo. 320.

### STATEMENT.

The pleadings in this case so fully exhibit the history of the occurrence from which this action emanated, that they are reproduced at length and intact. Plaintiff's complaint was as follows:

"Plaintiff for his cause of action says that at the time hereinafter mentioned, defendant was the publisher, printer and proprietor of a certain newspaper of large circulation published in the city of St. Louis, State of Missouri, and known as the St. Louis Post-Dispatch; that on the 13th day of March, 1898, there was printed and published in said newspaper the following false, defamatory and libelous article of and concerning the plaintiff, to-wit:

### UNCOVERING A HUGE SWINDLE.

Two Market Street Ticket Brokers Under Arrest.—Detectives Crack a Safe—In Search of Evidence in the Scalper's Office of "Jack" Friedman.—R. H. McCloskey also Accused.

Forgery and the "Raising" of passes and Transportation Jointly Charged Against the Prisoners.

Pedestrians who looked into the office of J. H. Friedman, ticket broker, 1801 Market street, yesterday, saw two men drilling into a huge iron safe in the same manner that expert cracksmen operate.

Instead of daylight burglary, as appeared at a glance, it was an effort by detectives Healy and McGrath to secure contraband matter as evidence in what prominent railroad officials say is one of the most gigantic ticket swindles in St. Louis. Besides their equipment of safe-blowers' tools, the detectives were fortified with a search warrant authorizing them to take unlimited liberties in Friedman's ticket office. Meanwhile the broker, who is known throughout the West as "Jack" Friedman, looked on in silence.

He was a prisoner, arrested on the charge of issuing forged tickets.

About the same time L. H. McCloskey, another ticket broker, at 1731 Market street, was also arrested on a similar charge. Both brokers were under indictment, true bills having been returned by the February grand jury in its final report Friday. It is alleged that Friedman and McCloskey operated jointly in the disposition of fraudulent tickets.

The warrants for the brokers were served by deputy sheriffs, but the work of securing tickets and paraphernalia to be used as evidence in court was assigned to the detective department.

When the officers went to Friedman's place and asked for admission to his safe the request was refused.

"I cannot open the safe," Friedman is alleged to have said.

After some parleying, the detectives determined to use force, and while one stood guard, the other went out to get the tools with which to open the safe.

It required an hour's work before the innermost recesses of the safe was reached. As the third inside door sprung open under the pressure of the official jimmy, Friedman looked on in amazement. Detective Healy's hand delved into the steel box and brought out a bunch of tickets, punches, stamps and other paraphernalia, including a bottle of powerful acid labeled "ink eradicator."

It is asserted by the authorities that the acid was used in removing names of destinations and other writing on tickets. When a demand was made upon McCloskey for tickets, punches and other material in his possession he said:

"Wait a minute, please, until I get what you want." He got it; then he threw it into the fire. At least, that is the story told by the detectives.

McCloskey and Friedman were taken to the Four Courts. Friedman was released on bond, with Epstein & Burnstein as sureties. McCloskey was locked up in jail.

The charge set forth in the indictment is the forgery of the name of Henry Lihou, general ticket agent at Union Station. Behind this formal charge is a long story of alleged ticket manipulation which is attracting attention from railroad men throughout the west.

Briefly summarized, it is charged that Friedman kept a stamp which he obtained from McCloskey, and which is a facsimile of the stamp used at Union Station for the purpose of executing unused portions of round-trip tickets.

Friedman, it is alleged, has been the manipulator of the tickets. It is said that he is an expert on plugging tickets, raising passes, and in forging the name on the reverse side of tickets signed by the original purchaser. Friedman's ability, aided by the bogus stamp, made it possible for him to place on sale a large volume of transportation otherwise void.

It is claimed that for a long while Friedman has spent his evenings in "fixing" tickets, screened from public gaze by a high desk.

It is further alleged that a young man who is not yet under arrest, and who is an expert penman, has been in the employ of Friedman and McCloskey. His duty was to remove the destination from tickets by means of the "ink eradicator" and in the blank space thus created, fill in the destination - desired by the purchaser.

When there is a call for a ticket which is not in stock, the purchaser's order was registered with the understanding that he could be accommodated by calling later. In the interim, so it is alleged, the ticket would be "fixed" for the destination wanted.

For instance, it was an easy matter to take a ticket good for a fifty-mile ride, and by means of erasure and substitution, lengthen the transit power to meet the requirements.

Railroad men say the country has been flooded with bogus tickets for a year or more, and the forgeries were so clever as to escape detection in almost every instance. General passenger agents knew that a wrong prevailed, but it was a long while before they had even a semblance of a clew.

General Passenger Agent Townsend, of the Missouri Pacific, was one of the first to take up the case. He consulted Martin Clardy of the legal department. Martin & Bass, attorneys, were employed as supplemental counsel and detective Thomas Furlong was also retained.

As a result of investigation, suspicion was directed to Friedman and McCloskey, and the matter was presented to the grand jury in such a way that true bills were found. Among other plans brought into play by the railroads was the execution of test tickets, which it is said form a strong link in the evidence.

"I have nothing whatever to say," said McCloskey when a reporter for the Post-Dispatch talked with him in the jail last evening.

"It is charged that you burned tickets and other evidence sought by the detectives," said the reporter. "That is not correct," replied the imprisoned broker, "but I do not care to discuss my case at all."

Friedman is looked upon by the authorities as the prime mover in the alleged frauds, while McCloskey is regarded as a confederate.

An amusing incident in connection with the case is a mistake made by a deputy sheriff who went to Union Station Friday night, expecting to find Friedman to take a train out of the city.

While the deputy was looking around for his man, whom he did not know by sight, somebody called out: "there goes Friedman now."

At the same time a dapper young man hurried through the

station gates accompanied by a slightly dressed young woman. The deputy did not reach the couple, and he was glad soon afterwards that he didn't, for he was informed that the Friedman who passed through the gates was not the ticket broker at all but a wealthy young man who had been married less than a day and was en route with his bride to the east on a wedding tour.

It is given out on reliable authority that other arrests will be made, and further developments are expected.

"Plaintiff says that said publication was willful, wanton and malicious, and that he has been greatly damaged thereby.

"Plaintiff, therefore, sues for $5,000 actual damages and $5,000 punitive damages, for which he prays judgment."

The answer of defendant was in the following language:

"Now comes defendant and admits that it is a corporation and the publisher of the newspaper in the city of St. Louis, known as the St. Louis Post-Dispatch, and admits the publication in said paper of the article set forth in plaintiff's petition on the 13th day of March, 1899, but denies that said publication was false, defamatory or libelous of plaintiff in any sense.

"And further answering, defendant says that the facts set forth in said article of and concerning plaintiff were true.

"And further answering, defendant says that said article set out in the petition was a fair and truthful narrative of the proceedings in the criminal court of the city of St. Louis in connection with the indictment of plaintiff, and one John McCloskey, and of the arrest of plaintiff and said McCloskey thereunder, and explanatory of the charge contained in said indictment, and that said publication was made by defendant in the performance of its duty as a public journalist, and solely for the purpose of giving the public information concerning the administration of public justice in the city of St. Louis, and that said publication was made after careful investigation and as a matter of news, without

any injurious comments and without any malice toward plaintiff; that the said publication was legitimate public news, and defendant says that said publication was privileged in the law.

"And further answering, and as explanatory of the circumstances under which, and the motives with which the publication complained of in the petition was made by defendant, defendant says that said publication was a fair and truthful narrative of the proceedings in the criminal court of the city of St. Louis in connection with the indictment of plaintiff and one John McCloskey, and the arrest of plaintiff and said John McCloskey thereunder, and also was explanatory of the circumstances of said arrest and of the charge contained in said indictment, which were of public interest to the citizens of St. Louis, and that defendant made full and careful investigation from all available sources, including the statements of said indicted parties, before making said publication, and that the publication was made without injurious comments and without malice."

A jury trial resulted in a verdict for plaintiff for $800 compensatory damages and $2,000 punitive or exemplary damages. A motion for new trial was sustained, upon the grounds that the circuit court erred in excluding evidence offered by the defendant, and in admitting evidence offered by plaintiff, and that the verdict in respect to both compensatory and exemplary damages was so excessive, as to indicate passion and prejudice on the part of the jury. For the purpose of passing on the propositions arising on this record, the proof of the respective parties is not required to be recited fully or at length, but questions based upon rulings upon evidence at the trial will be considered with such fragmentary portions of the testimony quoted so far as may be deemed essential.

REYBURN, J. (after stating the facts as above).—
1. In support of the lower court's action upon the mo-

tion for new trial, respondent urges that the court erred in excluding testimony of defendant's reporter, who obtained and prepared for publication the article complained of as libelous to the effect that he had no personal acquaintance with plaintiff and bore no malice or ill will toward him; but the record, as exhibited, discloses that questions seeking to elicit this character of testimony were addressed to and fully answered by this witness, whose testimony was offered in form of deposition, and that defendant derived the full benefit of his testimony to establish the absence of any individual malice by the author of the article toward plaintiff. Upon the hypothesis, however, that the ruling of the trial court in this regard has been erroneously transcribed, it may be proper to remark that in the opinion of this court, such testimony was competent and proper. If the publication had been dictated by express malice against plaintiff, such fact could have been established by plaintiff and imputed to defendant. Buckley v. Knapp, 48 Mo. 152; Haehl v. Railroad, 119 Mo. 325. And as the plaintiff sought to recover punitive, as well as compensatory damages, such testimony was admissible, as any facts or circumstances disproving or tending to disprove malice are admissible for the purpose of mitigating the punishment by way of exemplary damages. Weaver v. Hendrick, 30 Mo. 502; Lewis v. Humphries, 64 Mo. App. 466. The motives or purposes with which the slanderous words were spoken, lie at the very foundation of malice, and are the conditions upon which exemplary damages are based; and, accompanied with the caution to the jury that evidence of the intention and motive of defendant might be considered for the purpose of abating the punitive damages, but did not constitute a defense or bar to the action, such testimony was admissible. Callahan v. Ingram, 122 Mo. 255, and commentators cited.

2.  The petition embraced no elements of special damages, but simply and generally charged that plain-

tiff had been greatly damaged by the publication, with prayer for $10,000 damages, actual and punitive, and even contained no express averment that plaintiff was engaged in business of any description. The court, however, at the trial permitted evidence to be introduced of the suspension of plaintiff from the ticket brokers' association and also admitting plaintiff's testimony of decrease in his business earnings.

In Hughes v. Telegraph Co., 79 Mo. App. 133, this court adopted the definition announced by the Federal Supreme Court of special damages: "Special, as contradistinguished from general, damage, is that which is the natural, but not the necessary consequence of the act complained of." Roberts v. Graham, 73 U. S. (6 Wall.) 578.

There was no foundation for the admission of either species of testimony in the plaintiff's statement of his cause of action, and all such testimony should have been rigorously excluded. This position is abundantly supported by commentators as well as by adjudicated cases. "The general rule is that no evidence of special damages is admissible, unless it be averred in the pleadings; and this is so whether special damages be the gist of the action, or be used as matter of aggravation when the words are in themselves actionable." Starkie, Slander and Libel (5 Ed.), p. 489; Newell, Slander and Libel (2 Ed.), p. 779; 3 Sutherland, Damages (2 Ed.), sec. 1215; Steibeling v. Lockhaus, 28 Sup. Ct. Rep. (21 Hun) 457; Hatt v. Evening News Ass'n, 94 Mich. 119. "Special damages, whether resulting from tort or breach of contract, must be particularly averred, in order that the defendant may be notified of the charge and come prepared to meet it." Roberts v. Graham, 73 U. S. (6 Wall.) 578.

3.   The third instruction given for plaintiff was as follows:

"The court further instructs the jury that if they find for the plaintiff, in estimating the damages they

may take into consideration the character of the defamation, the circumstances under which it was published, the extent of the circulation of the paper, and of the publicity thus given to the libel, the absence of any apology and the pecuniary circumstances of the defendant.''

There is not a syllable to be found in the evidence respecting an apology; the record is dumb and silent as to any such reparation being asked for or declined. In this negative condition of the testimony, the attention of the jury should not have been directed to the absence of an apology as a circumstance to be taken into consideration in estimating plaintiff's damages, as it was clearly calculated to have a material effect in the computation of the exemplary, if not the compensatory, damages awarded. The instruction was misleading and prejudicial in this regard, and tended to emphasize and render prominent and conspicuous a phase of the case, respecting which no testimony has been introduced on either side. Instructions should be confined safely within the bounds of the evidence introduced and should not be given without substantial testimony to support them. Hewitt v. Steele, 118 Mo. 463; Mateer v. Railroad, 105 Mo. 320; Kansas & Texas Coal Co. v. Millett, 50 Mo. App. 382.

4. Among other grounds for its action in sustaining the motion for new trial, the circuit court assigned that the verdict was so exorbitant as to both classes of damages awarded, as to indicate passion and prejudice on the part of the jury. In a long, unbroken line of decisions of the Supreme Court, as well as of this court, the rule has been frequently proclaimed that it is not only the prerogative, but it is the peculiar and special duty, of trial courts to grant new trials, when the verdict is deemed arbitrary or manifestly wrong, or when the verdict appears to be the result of passion, prejudice or misconduct on the part of the jury, and that unless it is manifest that the trial court has abused its judicial discretion, or that injustice has been done, its ruling will

not be disturbed by the appellate courts. Kuenzel v. Stevens, 155 Mo. 280; Chouquette v. Railroad, 152 Mo. 257; Lee v. Geo. Knapp Co., 137 Mo. 385; Parker v. Cassingham, 130 Mo. 348; Bank v. Wood, 124 Mo. 72; Hewitt v. Steele, 118 Mo. 463; McCullough v. Ins. Co., 113 Mo. 606; Price v. Evans, 49 Mo. 396; Reed v. Ins. Co., 58 Mo. 421; Woolfolk v. Tate, 25 Mo. 597; Mason v. Onan, 67 Mo. App. 290; Powell v. Railroad, 59 Mo. App. 335; Ensor v. Smith, 57 Mo. 584; Longdon v. Kelly, 51 Mo. 572. As far back as the last decision of the Supreme Court above relied on, the eminent jurist delivering the opinion observes:

"But in this connection, 'it is well enough to make another remark. Constant complaints are reaching us that in some of the circuits the rule adopted here is followed [i. e., to refuse to weigh the evidence], and that the judges consider themselves bound thereby. But this is founded in an entire misapprehension. The trial courts have opportunities which we have not. In witnessing and presiding over the trial, they are put in possession of facts which we can not possibly attain. They see the witnesses; can form an opinion respecting their veracity; can observe whether they are biased or prejudiced; can notice their willingness or unwillingness, and a great many other circumstances which it is impossible to transfer to paper. They can also form a correct conclusion as to whether any improper influences operated on the jury in producing the verdict. All these considerations render it peculiarly proper that the question of granting new trials, on account of the verdict being against the weight of testimony, should be exclusively exercised by the court trying the cause, and where the trial court is of the opinion that the verdict is not supported by the evidence, or is against the weight of evidence, it should never hesitate in exercising the power and giving the aggrieved party a new trial."

All presumptions are in favor of the action of the trial court, and the exercise of the right and duty of

granting new trials, deemed proper by the trial courts in the attainment of justice is commendable and should be upheld under the rules of law and limitations above declared. We can find no evidence in this record of any abuse of its discretionary authority by the trial court, and the judgment is, accordingly, affirmed. *Bland, P. J.*, and *Goode, J.*, concur.