Motion to strike abstract of record allowed in part February 18, 1930;
argued January 20; reversed March 31; rehearing denied
June 9, 1931

## MANNIX *v.* THE PORTLAND TELEGRAM
(284 P. 837, 297 P. 350, 300 P. 350)

476

*Joseph, Haney & Veatch,* of Portland, for appellant.
*Frank J. Lonergan,* of Portland, for respondent.

PER CURIAM. Plaintiff moves to strike out the abstract of record on file herein for the reasons: (1) that it does not contain the amended complaint upon which the issues were joined and the case was tried; (2) "that the said record as filed contains from pages 21 to 615, inclusive, a purported record of the testimony taken during the trial of the said case, but this record is not complete and important evidence has been left out, and the consideration of the case on appeal upon such partial and incorrect record would tend to mislead the court"; and (3) "that the said abstract of record does not conform to the rules of this court and the printing of a purported and incomplete copy of the record together with the abstract of record in the same book is contrary to the rules of the supreme court."

If, in fact, issues were joined on an amended complaint and not the original complaint as set forth in the abstract of record, respondent, under rule 7 of the supreme court, may if he "shall deem the appellant's

abstract imperfect or unfair'' file a supplemental or additional abstract setting forth such part of the record ''as he shall deem necessary to a full understanding of the questions involved in the appeal.'' We are at a loss to understand why appellant should include in the abstract of record several hundred pages purporting to be a record of the evidence. The transcript of the evidence is on file. The printing of the evidence in the abstract is an unwarranted item of expense which could not be assessed as a disbursement on appeal. It violates the purpose and spirit of rule 11 of this court. Under the revised rules, assignments of error have no place in the abstract of record.

The motion to strike the entire abstract of record from the files is denied, but that portion thereof from page 21 to page 611, inclusive, is ordered stricken. Respondent may have 10 days from date hereof to file a supplemental abstract setting forth the alleged amended complaint, if he sees fit to do so.

RAND and McBRIDE, JJ., not participating.

---

ON THE MERITS
(297 P. 350)

*John C. Veatch,* of Portland (Joseph, Haney & Veatch, of Portland, on the brief), for appellant.

*Frank J. Lonergan,* of Portland, for respondent.

478

KELLY, J. Among the assignments of error discussed in defendant's brief are:

That the court erred in instructing the jury to consider what effect the publication had upon plaintiff in his profession and upon him as an individual.

That the court erred in refusing defendant the right to cross-examine plaintiff concerning plaintiff's

testimony that defendant had made prior attacks upon plaintiff. We will discuss these assignments of error in the order stated.

■ In his amended complaint, plaintiff alleges that he has practised his profession in Portland since 1911, and has enjoyed a large and lucrative practice. "And further, the betrayal of a client is viewed by the legal profession, as well as by every one else, with peculiar abhorrence, and, therefore, the publication of the aforesaid libel has brought this plaintiff into the public hatred and contempt of those who read the aforesaid libel and believe it and the public generally." There is, however, no allegation in the amended complaint of damages to plaintiff in his professional capacity. Neither is there any allegation of loss of business. Moreover, there is no testimony either that plaintiff was damaged in his professional capacity, or that he suffered loss of business.

A case, very similar to the one at bar, decided by the supreme court of Michigan, announces the law applicable where there is neither pleading nor proof that plaintiff was damaged in his professional capacity or suffered loss of business by reason of the publication in question. The Michigan court, speaking through Mr. Justice Grant, said:

"All charges of disreputable or criminal conduct tend to injure every man in his profession, trade, or occupation; but the law does not permit recovery therefor unless the words be spoken of him in regard to such profession, trade, or occupation, and loss is alleged and proved. Every such plaintiff can recover for injury to feelings and damage to his reputation. If he desires to go beyond this, it is a wholesome rule to require him to connect the libelous charge by the proper colloquium with such profession, trade, or occu-

pation, and to allege special damages. We think this declaration was not sufficient to justify the court in submitting to the jury the question of damages in his profession.

"2. The introductions were erroneous for another reason, viz., there is not a·scintilla of evidence upon the record that plaintiff was injured in his profession. Upon this the record is silent. If it should appear that plaintiff's business had increased after the publication of this article, would the jury be justified in finding that he had suffered loss in consequence of the publication? When one claims loss in his business or profession, it is certainly in his power to show such loss. Is it not a reasonable rule which requires him to do so before he can obtain a judgment? When no such loss is shown, the injury must be confined to injured feelings and injured reputation." *Smedley v. Soule,* 125 Mich. 192 (84 N. W. 63, 65).

This doctrine finds support in the following cases: *Gandy v. Humphries,* 35 Ala. 617; *Gambrill v. Schooley,* 95 Md. 260 (52 Atl. 500, 63 L. R. A. 427); *Friedman v. Pulitzer Pub. Co.,* 102 Mo. App. 683 (77 S. W. 340); *Dicken v. Shepherd,* 22 Md. 399; *Loftus v. Bennett,* 68 App. Div. 128 (74 N. Y. S. 290); *Roddy v. Gazette Co.,* 179 Iowa 50 (161 N. W. 94); *Brinkmann v. Taylor,* 103 Fed. 773; *Cramer v. Cullinane,* 2 MacArthur (9 D. C.) 197; *Holston v. Boyle,* 46 Minn. 432 (49 N. W. 203); *Line v. Spies,* 139 Mich. 484 (102 N. W. 993).

■ It must be remembered that the question here discussed is not upon the sufficiency of a complaint, tested by demurrer, as in the case of *Peck v. Coos Bay Times Pub. Co.,* 122 Or. 408 (259 P. 307). In the case at bar the amended complaint states a cause of action because the article set forth therein is libelous per se.

■ We hold that the court erred in instructing the jury that in awarding damages the effect of the publica-

tion upon plaintiff's reputation or standing in his profession could be considered by them. This instruction was beyond the purview of the pleadings and unsupported by any evidence.

The authorities upon the question of whether or not there is a presumption that plaintiff's reputation, as an attorney, is good are few in number. The parties herein cite but two. A diligent search on our part fails to augment the number. Those cited hold that there is no such presumption: *Scott v. Times Mirror Co.*, 178 Cal. 688 (174 P. 312); *Aston v. Examiner Printing Co.*, 226 Fed. 496.

The question submitted to the jury was not whether plaintiff had a good reputation, as an attorney, but as to the effect thereon of the publication in question. While we are not unaware of authorities at variance with our views, we think the better reasoning and weight of authority support them.

For the reasons assigned, we also hold that the circuit court erred in instructing the jury that in awarding damages, consideration could be given to loss of business.

■ The court also erred in abridging the cross-examination of plaintiff as outlined in the foregoing statement of facts. It will be borne in mind that plaintiff charges actual malice. His statement that defendant had been making a buffer of him is susceptible of but one meaning, namely, that defendant had made prior unwarranted attacks upon him, and in fact the plaintiff so testified. This bears directly upon the question of actual malice. Where an adverse witness gives testimony bearing upon a question directly in issue, cross-examination with respect to such testimony is a matter of right and a denial of that right is reversible

error: *Harrold v. Territory of Oklahoma*, 169 Fed. 47, 17 Ann. Cas. 868; *Heard v. United States*, 255 Fed. 829; *Galindez v. United States*, 19 Fed. (2d) 352; *People v. McKernan*, 236 Mich. 226 (210 N. W. 219); *Prout v. Bernards Land & Sand Co.*, 77 N. J. L. 719 (73 Atl. 486, 25 L. R. A. (N. S.) 683). That defendant once offered and then withdrew a motion to strike this statement of plaintiff as unresponsive could in no wise affect defendant's right to cross-examine thereupon for such motion invited error.

Plaintiff cites cases holding that cross-examination need not be permitted upon immaterial testimony. These authorities are not in point here for the reason that plaintiff's testimony was not immaterial. Plaintiff also cites authorities to the effect that a party who permits incompetent testimony to be received without objecting or moving to strike cannot thereafter claim that error was committed by its reception. Those authorities are not in point because no such claim is urged by defendant. Defendant claims only that its right of cross-examination upon material testimony was denied.

■ Although the rule appears to be otherwise in Virginia and North Carolina, *American Bonding & Trust Co. v. Milstead*, 102 Va. 683 (47 S. E. 853); *Steeley v. Dare Lumber Co.*, 165 N. C. 27 (80 S. E. 963), no showing as to what will be elicited by proposed cross-examination of an adverse witness is necessary in order to preserve such record on appeal: *Eames v. Kaiser*, 142 U. S. 488 (12 S. Ct. 302, 35 L. Ed. 1091); 4 C. J. 76, note 26; *Cunningham v. Austin, etc., R. Co.*, 88 Tex. 534 (31 S. W. 629); *Long v. Red River, etc., R. Co.*, (Tex. Civ. App.) 85 S. W. 1048; *Hutts v. Hutts*, 62 Ind. 214; *Le Doux v. Seattle N. P. Ship Building Co.*,

114 Wash. 632 (195 P. 1006) ; *Martin v. Elden,* 32 Ohio St. 282; *O'Donnell v. Segar,* 25 Mich. 367; *Harness v. State,* 57 Ind. 1; *Hyland v. Milner,* 99 Ind. 308.

We have carefully considered the other assignments of error and deem them untenable, but for the reasons above stated this case is reversed and remanded.

BROWN and BELT, JJ., concur.

RAND and ROSSMAN, JJ., did not participate.

BEAN, C. J., and CAMPBELL, J., dissent.

---

CAMPBELL, J., (dissenting).

This is an action for libel. In order to get a full understanding of the issues, it is necessary to set out the pleadings at length. The second amended complaint and the one upon which the case was determined, omitting the title, reads as follows:

I

"That the plaintiff is a citizen of Portland, county of Multnomah and state of Oregon, and is a lawyer by profession and is admitted to practice in the courts of Oregon, the Federal Courts and the Supreme Court of the United States, and has been a lawyer since 1903.

II

"That the Portland Telegram is a corporation and publishes a daily newspaper in Portland, Oregon, and has a circulation throughout the state of several thousand copies per day.

III

"That the plaintiff herein has been at all times and for several years past the attorney for A. Neppach, and on or about the 27th day of September, 1928, was instrumental in causing the grand jury of Multnomah county to indict one Harry Knight, alias Harry Mc-

Donald, for the larceny of several automobiles, the property of the said A. Neppach, and during the investigation preparatory to presenting evidence relating to said larceny to the grand jury, and on or about September 27, 1928, the plaintiff herein was informed that the said Harry Knight was a fugitive from justice and that he was wanted in Missouri for murder and other criminal charges, and that accordingly, the said plaintiff herein gave this information to the sheriff of Multnomah county, who, acting upon said information, obtained from Inspector Graves the photograph and finger-print records of said criminal, and thereupon the said sheriff and his deputies went to Salem where the said criminal was sojourning and placed him under arrest and brought him to the county jail of Multnomah county and held him as a fugitive from justice without bail.

IV

"That on the 2d day of October, 1928, the defendant, its agents and servants, caused the following libel to be published concerning this plaintiff herein:

" 'LAWYER BETRAYED HIM, SAYS ACCUSED. Declaring that he had kept his silence as long as human endurance would permit, Harry Knight, alias Harry McDonald, held in the Multnomah county jail on an old murder charge in Missouri, called in newspapermen Monday night and in the presence of three reporters, one county official and two jailers, hurled at Tom Mannix, Portland attorney, to whom McDonald said he had gone for legal advice, charges of a grave nature, involving an alleged plot on Mannix' part to get the fortune of Tony Neppach, a client of Mannix.'

"According to McDonald's story, Mannix had known for nearly two years that McDonald was wanted in Missouri, McDonald having informed him of this fact when he said he engaged Mannix as his attorney. It was through Mannix that McDonald was arrested. Mannix stated he had become suspicious of Knight, known then in Portland as Harry McDonald,

and had traced him through Bertillon records. McDonald also accused Mannix of 'bleeding' him. McDonald said that since the first of the year he had paid Mannix sums ranging from $100 to $500 at various times.

"MANNIX DENIES CHARGE. When the Telegram informed Mr. Mannix of McDonald's charges, he branded them as 'utterly false.' He denied that he conferred with McDonald as his attorney or that he knew McDonald was wanted in the East for jumping bail on a sentence for murder until a few days ago.

" 'A man named Nelson gave me the tip a week ago concerning McDonald being wanted in Missouri,' Mannix said. 'I have been McDonald's constant enemy since I met him in June and from time to time I warned Mr. Neppach against him. It was on this tip that we traced down his record and he was identified.'

"Mannix said McDonald 'propositioned him' to trim Neppach and that he flatly refused to enter into such a deal and again warned Neppach that McDonald was crooked and out to get his money.'

"NEPPACH LAUDS ATTORNEY. Neppach said that Mannix told him that 'McDonald was out to trim me.' Neppach said his dealings with Mannix had convinced him that Mannix was above reproach and that 'McDonald was trying to trim both of them.'

" 'McDonald's charges are ridiculous and false,' said Mannix. 'I never took a nickel from McDonald and there are attorneys who know it.'

"McDonald told how he constantly was fearful that Mannix would betray him. 'I took him into my confidence as my attorney,' McDonald said, 'and told him everything. Mannix told how he traced me through police records. That's all bunk. He knew who I was because I had told him. He betrayed the confidence of a client.'

"PRISONER TELLS STORY. McDonald's statement in brief follows: 'When I came to Portland I wanted to go into business before the public and I inquired around for an attorney. Tom Mannix was recommended and I went to him. I took him out to my house

and in the presence of my wife I told him the whole story of how I was accused wrongfully in Missouri, tried and convicted. He said he would regard my statements as those of a client to his attorney.'

"It was during the time Condit & Conser were going through bankruptcy that I was asked to take over the business. At that time I had a furniture business. Tony Neppach, who was financially involved in the Condit & Conser concern, told me he would back me and that he would loan me all the money I wanted to operate the new venture.

"Says Home Visited. It was about this time that Mannix came to my home at 1062 Union Avenue North and made me a proposition, which I turned down. I told him I did business on the square and that I wouldn't go that route. Mannix told me he was very powerful in Portland. He told me he owed Neppach several thousand dollars and that Neppach was getting old and had no heirs to give his fortune to. He said we both could make some money.

" 'What do you mean?' I asked him.

" 'You know what I mean,' Mannix said to me.

" 'You know my name and you've got the dope on me,' I said to Mannix, 'but I can't go that route.' "

(The innuendo here is that the plaintiff attempted to get the said Harry Knight, alias McDonald, to join with him in a conspiracy to rob the plaintiff's client, A. Neppach.)

"Promise Recounted. 'I told Mannix that I couldn't do business with a man who wasn't on the square and that I would get another attorney. He promised not to tell who I was. So I got Dan Powers to represent me. Mannix came to me later and told me I had made the mistake of my life.

" 'Next thing I knew I was arrested on a charge of larceny by bailee involving the sale of five cars. Neppach, who brought the charge through Mannix, then had control of all my property and was amply secured

for any business dealings I might make. I was paying him 1 per cent interest on all money involved in each sale, besides 8 per cent on the loans he had made me.

" 'Well, I felt uneasy. I knew I would have to go before the federal court, so I again went to Mannix and I said to him, 'Tom, you know who I am. You wouldn't ask me my name in court, would you?'

" 'He said, 'Oh, forget it. We'll fight it out. If you win, all right, and if I win, all right.'

"McDonald Uneasy. 'His actions made me more uneasy than ever. I learned that he and Dan Powers once had law offices together, and so I went to Powers and asked him if Mannix would betray a confidence. He wanted to know why I asked, but I refused to tell him. He said Mannix had always been square.'

" 'I gave Mannix various sums, ranging from $100 to $500 to keep mum. He said to me one day as he smiled, 'You know this is but a loan.'

" 'The next I knew I was arrested at the fair grounds in Salem. I called Dan Powers and told him the only man in Portland who knew of the old charge in Missouri was Mannix.'

" 'I learned also that Mannix and another lawyer, A. L. Wirin, in my absence, had gone to my office and represented themselves to be attorneys representing trustees, and seized all my papers and personal effects.'

"McDonald said he wanted it understood that no official had protected him while he lived in Portland as Harry Knight. He said the only man who knew his secret was Mannix. He said the total amount he had paid Mannix in 'hush' money would amount to between $2,000 and $2,500. He declared that he would not have involved Mannix had it not been for the fact that when he was taken into federal court Monday to be examined as to his assets in bankruptcy proceedings Mannix had brought for Neppach, Mannix 'razzed' him about his true name and made references to his trouble in Missouri. 'That broke the camel's back,' he said.

"McDonald related a long story about the Missouri affair, declaring he did not kill the man he was convicted of killing. He also denied that he was involved in a bank holdup."

## V

"That the aforesaid libel is false and malicious and the plaintiff herein never received from the Harry Knight, alias McDonald, either $2,500 or $2,000 or any other sum whatsoever and never was or acted as his attorney, but at all times acted solely and exclusively for A. Neppach and at no time was there any relation of attorney and client between the said plaintiff and the said Harry Knight, alias McDonald, and the said Harry Knight, alias McDonald, at no time ever made a confident of the said plaintiff, and the plaintiff now says that it was his duty to cause the apprehension of this convicted murderer and fugitive from justice, both as a citizen and as attorney for A. Neppach, from whom this Harry Knight, alias McDonald, by various pretexts and crimes, obtained the sum of over $30,000.

## VI

"That the defendant corporation and newspaper published the said libel wilfully, maliciously and falsely and without just cause.

## VII

"That the plaintiff herein has practiced his profession in Portland since 1911 and has enjoyed a large and lucrative practice and has never betrayed anyone's confidence directly or indirectly and the profession of law upholds as one of its chief canons of ethics the duty of a lawyer at every peril to himself to regard as sacred the information received by him from clients. And further, the betrayal of a client is viewed by the

legal profession as well as by everyone else with peculiar abhorrence, and, therefore, the publication of the aforesaid libel has brought this plaintiff into the public hatred and contempt of those who read the aforesaid libel and believe it and the public generally.

## VIII

"That the plaintiff alleges that the foregoing publication is libelous per se and that he has been damaged in the sum of seventy-five thousand dollars ($75,000) because of the publication and circulation of said libel.

## IX

"And further and by way of punitive damages, the plaintiff alleges and claims that he was damaged in the sum of twenty-five thousand dollars ($25,000) as punitive and exemplary damages.

"Wherefore, the plaintiff prays for a judgment against the defendant for the sum of one hundred thousand dollars ($100,000) and for his costs and disbursements."

The answer of defendant in effect denied certain allegations of the complaint, but admits the publication of the alleged libelous article verbatim and then in paragraph IV alleges as follows:

"The matters alleged set out by plaintiff in paragraph IV of his amended complaint herein, and extracts from said article so published, as aforesaid. That said article was and is a fair statement of the facts and circumstances which occurred at the time and place mentioned therein, and is a true and correct account of what was said and done by the parties mentioned in said article. That said article was not published with malicious intent but as a matter of news."

It is a little difficult to determine whether it is intended by this above paragraph to say that the con-

tents of the article are true or that it simply is a true transcript of what the parties told the reporter. The case was tried on the theory that it was an allegation of the truth of the statements.

· The reply in effect denies all of the answer except such allegations as admit certain statements made in the complaint. There were a number of exceptions, to the rulings of the court, taken during the progress of the trial but the only ones this court is called to pass upon are those set out in defendant's brief.

The first assignment of error is:

"The court erred in failing to confine plaintiff's right to recovery to such damages as he suffered in his professional capacity.

"1. By admitting the testimony of the plaintiff concerning the effect of the publication upon him personally.

"2. By instructing the jury to consider what effect the publication had upon him in his profession and upon him as an individual.

"3. By instructing the jury to take into consideration injury to plaintiff's feelings and his mental suffering."

We must first determine whether the alleged publication is libelous per se. It will be observed that the article published is in two parts. The summary or interpretation made by the defendant, and the quoted statement of Harry McDonald, alias Knight. It must be conceded that the summary and interpretation is the only one that a reasonable person could draw from the quoted statement.

" 'Lawyer betrayed him,' says accused. Declaring that he had kept his silence as long as human endurance would permit, Harry Knight, alias Harry McDonald, held in the Multnomah county jail on an old murder charge in Missouri, called in newspaper men Monday night and in the presence of three reporters,

one county official and two jailers, hurled at Tom Mannix, Portland attorney, to whom McDonald said he had gone for legal advice, charges of a grave nature, involving an alleged plot on Mannix's part to get the fortune of Tony Neppach, a client of Mannix.''

''McDonald also accused Mannix of 'bleeding' him. McDonald said that since the first of the year he had paid Mannix sums ranging from $100 to $500 at various times,'' and again,

''He said the total amount he had paid Mannix in 'hush' money would amount to between $2,000 and $2,500.''

This accuses Mannix of a serious offense. The only conclusion that a reasonable man of average intelligence could draw from ''bleeding'' and ''hush'' money is that Mannix was guilty of extortion. The only conclusion a reasonable person of average intelligence could draw from the allusion, ''A plot on Mannix's part to get the fortune of Tony Neppach,'' is that Mannix intended by unlawful means to deprive his client, Neppach, of his property.

We agree with learned counsel for defendant when he says, ''To say of an attorney that he is a thief and has stolen from his clients is libelous per se when applied to him, both as an individual and in his professional capacity because he is charged with an act which is unlawful regardless of his profession or business'': Appellant's brief, p. 16.

Let us apply the above principles of law to the instant case. Here the publication is certainly libelous per se to plaintiff in both capacities. There is no dispute between counsel as to the definition and classification of libel. They each suggested to the court such definition and classification in identical words. If the plaintiff was acting as attorney for McDonald, which

he denies, and from such employment received the information that McDonald was a fugitive from justice, the law of Oregon required him to "maintain inviolate the confidence, and at every peril to himself, to preserve the secrets of his clients": § 32-201, sub-sec. 5, Oregon Code 1930. This, however, does not give him the right to "bleed" or demand or accept "hush" money from his client: § 14-237, Oregon Code 1930. If he were not acting as attorney for McDonald he might be guilty of "compounding or concealing a crime for a reward": § 14-425, Oregon Code 1930.

There can not be any doubt that the publication is libelous to the plaintiff both in his professional and individual capacity.

Paragraph VII of plaintiff's complaint alleges:

"That the plaintiff herein has practiced his profession in Portland since 1911, and has enjoyed a large and lucrative practice, and has never betrayed any one's confidence directly or indirectly, and the profession of law upholding as one of its chief canons of ethics, 'The duty of a lawyer at every peril to himself to regard as sacred the information received by him from clients.' And further, 'the betrayal of a client is viewed by the legal profession as well as by everyone else with peculiar abhorrence, and therefore, the publication of the aforesaid libel has brought this plaintiff into public hatred and contempt of those who read the aforesaid libel and believe it and the public generally.' "

There is no place in his complaint where he alleges that he lost business as a lawyer. He simply alleges that he has been damaged by reason of said publication in the sum of $75,000 and that in addition by reason of its falseness and maliciousness on the part of the defendant, plaintiff should be awarded $25,000 as punitive and exemplary damages.

At the proper time the defendant requested the following instructions:

"This is an action for libel. Libel is a printed publication tending to blacken the memory of one who is dead or the reputation of one who is living. Libels are classified as:

"1st. Those which impute to a person the commission of a crime.

"2d. Those which have a tendency to injure a person in his office, profession, calling or trade; and

"3d. Those which hold him up to scorn, ridicule and contempt and impair him in the enjoyment of general society.

"This action is based upon the second class, viz.: 'A publication which the plaintiff claims effects him in his profession.' Therefore, you are to consider in this case what effect, if any, the publication in question has had upon the plaintiff in his profession as a lawyer, and not what effect it may have had upon him as an individual."

Covering the subject, *the Court gave the following instructions:*

"This is an action for libel. Libel is a printed publication tending to blacken the memory of one who is dead or the reputation of one who is living, and expose him to public hatred, contempt or ridicule. Libels are classified as:

"First: Those which impute to a person the commission of a crime;

"Second: Those which have a tendency to injure a person in his office, profession, calling or trade; and

"Third: Those which hold him up to scorn, ridicule or contempt, and impair him in the enjoyment of general society."

This action is based upon the second and third classes, to wit:

"A publication which the plaintiff claims affects him in his profession and holds him up to hatred and contempt generally. Therefore, you are to consider in

this case what effect, if any, the publication in question has had upon the plaintiff in his profession as a lawyer, and what effect it may have upon him as an individual.

"You have the right in awarding damages to take into consideration the plaintiff's business experience, length of time he practiced law, the loss of confidence from the said libel, the circulation of the libel and the number of copies circulated, injury to the feelings of the plaintiff, humiliation, loss of business and standing in his profession and in the community, and all the natural consequences of the publication as affected the plaintiff in his personal and professional capacity.

"It is well settled that in such cases as this a jury may consider as a basis of its award of actual damages all the facts and circumstances including the wide publicity given to the libel, plaintiff's prominence in the community where he lives, his professional standing, his good name and reputation, his injured feelings and his mental suffering."

An exception was taken to the refusal of the court to give the instructions requested. An exception was also taken to the instructions as given by the court.

Every publication that is libelous per se gives rise to but one cause of action. It cannot be said that the complaint herein confines that cause of action to damages to plaintiff simply as a lawyer. The defendant in his brief ignores all other parts of the complaint except that which the plaintiff alleges regarding his profession.

In paragraph V of the complaint:

"That the aforesaid libel is false and libelous and the plaintiff herein never received from Harry Knight, alias McDonald, $2,500 or $2,000 or any sum whatsoever, and never was nor acted as his attorney."

The allegations in the complaint regarding his professional standing are undoubtly pleaded to show that he was well known and had an extensive acquaintance.

Consequently would receive greater injury than if he were an obscure individual. The complaint being libelous per se to him as an individual, the court committed no error in admitting testimony of the effect such publication had on him as a man. Neither was there error in instructing the jury that they could award damages for injury sustained as a man and as a lawyer.

The court committed no error in refusing to give the requested instruction set out in defendant's specification. Neither did the court err in not limiting his instruction that the publication is libelous per se to plaintiff in his professional capacity. This disposes of plaintiff's assignments of error I and II. Assignment of error III:

"The court erred in refusing defendant the right to cross-examine plaintiff concerning plaintiff's testimony that defendant had made prior attacks upon plaintiff."

"The adverse party may cross-examine the witness as to any matter stated in his direct examination, or connected therewith, and in so doing, may put leading questions; but if he examine him as to other matters, such examination is to be subject to the same rules as a direct examination." Oregon Code 1930, § 9-1908.

Cross examination should be allowed a liberal range: *Ah Doon v. Smith,* 25 Or. 89 (34 P. 1093) ; *Sayres v. Allen,* 25 Or. 215 (35 P. 254) ; *Second Northwestern Finance Corp. v. Mansfield,* 121 Or. 236 (252 P. 200, 254 P. 1022).

The point at issue arose as follows: The plaintiff was on the witness stand giving evidence in his own behalf on direct examination. He had been testifying

regarding a telephone call he received from the defendant in reference to the article alleged to be libelous. He was asked by his counsel:

"Q. Where were you at the time?

"A. I was shaving myself in the bathroom when this phone came, and he said he was Seth Bailey from the Telegram and that he had a sensational story about me. I said, 'Is that so?' He said, 'Yes,' I said 'What about it,—what kind of a story have you got about me now?' He said, 'Well, you—McDonald, or Knight, says that you betrayed him and gave away—informed on him, and said that you were his attorney; that you betrayed him professionally,' and he said, 'We are going to publish the story.' Well, the Telegram had been making a buffer of me for about a year before, and I was pretty mad about it, and I said, 'Now, I want to tell you one thing: You just stop publishing that story about me because it is entirely false,' and I said, 'If you publish it, I am going to sue you for libel,' and I told him, I said to him, 'I am coming down to see you right off,' so Mr. Neppach came along in his car and we drove down to the Telegram office."

Most of the answer was not responsive to the question and was purely voluntary and on motion surely would have been stricken: *Cone v. Smyth,* 3 Kan. App. 607 (45 Pac. 247); *Hill v. State,* 194 Ala. 11 (69 So. 941, 2 A. L. R. 509). No such request was made by counsel but on the other hand they requested that it remain in the record. After cross-examining the witness at considerable length, counsel for defendant asked the witness:

"Q. You stated in your testimony that the Telegram had used you as a buffer for some time.

"A. That is true.

"Q. Prior to this publication?

"A. That is true.

"Q. What do you mean by that?

"A. I mean the Telegram had accused me of having corrupted one of the members of the supreme court, falsely and maliciously and without any truth in it.

"Q. Had they accused you of that, the Telegram? Have you the paper here showing it?

"A. No I haven't.

"Q. You had some papers here; will you please produce them. Those papers, where are they?

"A. My counsel has all the papers.

"Q. Where are they?

"Mr. Lonergan: I suppose they are in my office, Mr. Joseph.

"Mr. Joseph: Will you produce those papers?

"Mr. Lonergan: Well, you can produce them; you are a representative of the Telegram.

"Mr. Joseph: Well I am asking you if you are going to produce them. You had them here and I asked you about them, and you said you would produce them.

"Mr. Lonergan: No; I did not say anything of the kind.

"Mr. Joseph: You said you would show this and that and the other thing.

"Mr. Lonergan: Well, I will prove my case in my own way.

"Mr. Joseph: Well, you should do it now.

"Mr. Lonergan: No; now, just a minute; I will submit to the Court—I will produce my case and the exhibition as I deem best. I will try my own case. You are spokesman of the Telegram; why don't you produce them?

"Q. (By Mr. Joseph) Well, now, you say that they used you as a buffer.

"A. Yes.

"Q. What did they say about you that was untrue in connection with Judge Rand?

"A. I had a case in the Supreme Court, the Wemme case, and the lawyer who drew the will in that case didn't know how to draw it; the will was void, utterly

void. That same lawyer had charged $32,000 for probating the estate, and he sold the property for $47,000, and falsely represented to the Court that he had obtained $100,000 for it, and in order to cover his tracks he tried to make me out a crook and the Telegram was his vehicle in doing it.

"Q. Now, you are talking about me.

"A. Yes.

"Q. Well, you are talking about a good man.

"A. I guess that will hold you for a while.

"Q. Mr. Mannix, did you meet Judge Rand in the Imperial Hotel with Mr. Wicke?

"A. I did not.

"Q. Well, if Judge Rand swears that you did what would you say to that?

"A. Well, I did not.

"Q. You would say you did not?

"A. Yes, sir; I say I did not.

"Q. Who introduced Wicke to Judge Rand?

"Mr. Lonergan: Well now, your honor, I don't know where we are going here."

Then followed a rather heated argument between counsel. It was finally ended by the court saying: "Well, gentlemen, I don't believe there has been anything in this case so far that would warrant us going into all these matters which have been mentioned and the objection to that will be sustained."

"Mr. Veatch: Then if Your Honor please, if we are to be prevented from cross-examining the witness on that testimony, I ask that the witness' testimony that the Telegram had made a buffer of him be withdrawn.

"Mr. Joseph: No we will not do that; leave it in.

"Mr. Veatch: Yes, leave it in, Your Honor.

"Mr. Joseph: Yes, leave it in."

Plaintiff was then asked the following questions by defendants counsel, all of which were objected to and the objection sustained by the court:

"Q. Mr. Mannix, the Wemme case which you mentioned was a case in which you were trying to recover $500,000 which was left as a bequest by E. Henry Wemme for the purpose of constructing a home for unfortunate girls.

"Q. Mr. Mannix, how many cases did you bring concerning the Wemme property?

"Q. Mr. Mannix, you held an option on the mine of John L. Rand of your supreme court wherein you agreed to pay him $300,000 after the commencement of the first Wemme case.

"Q. Did you ever pay Judge Rand any money for the option?

"Q. Did anybody receive, any lawyer receive $32,000 for closing, administering the Wemme estate, the E. Henry Wemme estate?

"Q. Did you ever investigate the record of administration of that case, the Wemme matter?

"Q. Mr. Mannix, do you know what lawyer handled the administration of the Wemme case?

"Q. Do you know, as a mater of fact, that Judge Littlefield handled it entirely?

"Q. You are acquainted with E. W. Wickey, the alien property custodian, are you Mr. Mannix?

"Q. Also you were acquainted with Mr. Dow V. Walker, who was local alien property custodian?"

All these questions were asked as being pertinent to, and connected with what the witness said in his direct examination, by the use of these words: "The Telegram had been making a buffer of me for about a year before and I was pretty mad about it." The defendant contends that this statement was made with the idea of conveying the impression that the Telegram had made prior attacks upon plaintiff. There is nothing in the pleadings, nor was there anything introduced

in the evidence, showing that prior attacks had been made. The statement being purely voluntary and not responsive to any question should have been stricken upon motion, but no doubt was kept in the record by the defendant for the purpose of showing the animus of the witness against the defendant, thus lessening the weight of his testimony before the jury.

The statement of the witness was obviously incompetent to prove any prior attack by the defendant. The best evidence would be the publication itself and secondary evidence could not be received. Cross-examination may not be permitted on matters attempted to be proved by incompetent testimony, unless the testimony was admitted over the objection of the party desiring to cross-examine, and the court did not abuse its discretion in refusing to permit such cross-examination. Why should the court waste the time of himself, the jury, and the counsel for respective parties, in hearing incompetent testimony, when the ends of justice would be subserved by striking it out, and instructing the jury to disregard it. The learned trial judge in the course of the proceedings said:

"Well, I am not going to attempt to keep anything out of the record which I think ought to be in the record, and you make up your record, make an offer of proof that you desire on any proposition that you think is connected with your case."

The able counsel did not deem it of sufficient importance to put it in the record. The court committed no error in not permitting this part of the cross-examination.

Assignment of error, number IV.

"The court erred in refusing defendant the right to cross-examine Anthony Neppach, a witness for plaintiff, concerning Neppach's business relations with the plaintiff."

On his examination in chief, Anthony Neppach as a witness on behalf of the plaintiff, testified concerning the article and some of the matters there set up. On cross-examination, counsel for defendant asked him the following questions:

"Q. You have been interested in business with Mr. Mannix, have you, Mr. Neppach?

"A. Intersted with him?

"Q. Yes.

"A. As a partner?

"Q. Well, not as a partner, but interested with him in business transactions.

"A. Only as an attorney for me.

"Q. Did you ever have any financial transactions with him at all?

"A. I don't think so.

"Q. You purchased a part of the property?

"A. How?

"Q. I say, you purchased a portion of the property which they gathered in, Wickey, Wemme and Mannix, did you not?

"Mr. Lonergan: I don't want to interrupt you. I thought you had finished, but I want to object when you are through.

"Mr. Joseph: I just want to show the association. I'll change the question around a little.

"Q. Did you ever buy any real estate in which Mr. Mannix was interested?

"A. I never bought any real estate."

A few more questions of the same purport were asked and then the court sustained an objection and an exception was duly saved. The only purpose of such an examination would be to show the bias or prejudice that the witness might have in favor of the plaintiff. This was already accomplished by the showing that witness had great confidence in the plaintiff, and that plaintiff acted as his attorney for many years on all his business. It would add nothing to it by showing

what particular transaction he had performed as such attorney. There was no error committed by the court in sustaining the objections.

Assignment of error V.

"The court erred in holding that plaintiff is presumed to have a good reputation as an attorney."

The defendant requested the following instructions, which were refused and an exception taken:

"Reputation is what the public, generally, thinks of a man, and not what the individual thinks of himself. Everyone is presumed to have a good reputation as an individual but this presumption does not extend to his reputation in trade, occupation or profession. A man's reputation in trade, occupation or profession must be established by positive evidence and cannot be presumed. Before you can find for the plaintiff in this case, you must be convinced by the preponderance of the evidence that at the time of the publication complained of, the plaintiff enjoyed a good reputation and standing as a lawyer and that this reputation and standing has been injured and impaired by the publication in evidence here."

He also requested an instruction in effect; that the burden of proof was upon the plaintiff to establish his standing and reputation as an attorney and that unless he establish such from a preponderance of evidence, that the jury should find for the defendant. In covering this subject the court gave the following instructions:

"The law presumes a party's character to be good and that it is superfluous for him to prove that which is presumed."

"In determining whether or not the publication has injured the plaintiff in his profession and standing as a lawyer you may take into consideration among other things, what was his reputation and standing as lawyer at the time of the publication, and what effect, if any,

the publication has had upon that standing or reputation. In determining this, you are to consider the general character of his business, his financial standing as an attorney, and his general reputation."

The requested instructions would have been good law if the defendant's theory of the case were correct; that is, that the plaintiff could only recover for the injury suffered by him as a lawyer. We have already held that the pleadings are sufficiently broad to cover all the damages sustained either as a lawyer or as an individual.

The law of Oregon provides:

"All other presumptions are satisfactory unless overcome. They are denominated, disputable presumptions, and may be controverted by other evidence. The following are of that kind:

"1. That a person is innocent of crime or wrong": Oregon Code 1930, § 9-807, sub-sec. 1.

As a natural corollary, a person who is innocent of crime or wrong bears a good character, and this presumption follows him in any legitimate calling. The court did not instruct the jury that plaintiff's character as a lawyer was good. He advised the jury that in considering the effect the publication had upon plaintiff in his profession and standing as a lawyer, they should take into consideration many other things, and that they were to consder the general character of his business, his financial standing as an attorney, and his "general reputation." All that the court said in the instruction given is, "that the law presumes a party's character to be good." It is common knowledge that a mediocre lawyer may have an excellent character. The converse may be equally true. A very adroit and skillful attorney may have a very bad reputation as to his moral character. A good moral character is a valuable

asset to a person in any lawful occupation, trade or profession. Plainitff's reputation for skill or ability in his profession was not made an issue, neither in the publication nor by the pleadings or testimony. But his general moral character was. The court committed no error in refusing the instruction requested, nor in giving the one he gave.

Assignment of error VI:

"The court erred in admitting the testimony of Thomas Mahoney concerning statements made by one Harry McDonald."

One of the statements made in the publication is to the effect that plaintiff was McDonald's attorney for nearly two years; that plaintiff was the only one who knew McDonald's secret, and that secret was confided to him through the relation of attorney and client. This was one of the isues to be determined. The defendant having chosen to publish the story told it by McDonald, thereby became a joint tort-feasor with him. The record discloses that McDonald had been in Portland something less than two years. At the time of the publication he had not developed a very extensive business. It would not be probable under such circumstances that he would have need of, or would employ several attorneys during the same period. The testimony of Thomas Mahoney to the effect that McDonald employed him as an attorney during the period of the time the publication claimed the plaintiff was McDonald's attorney, as well as the testimony of Edwin Brazell to the same effect, while not conclusive on the issue, still should go to the jury as having a tendency to disprove the statement that plaintiff was McDonald's attorney for two years. In this view, it was not hearsay but primary evidence of the fact in issue. So no error was committed.

Assignment of error VII:

"The court erred in withdrawing from the jury the testimony of Elijah Corbett and exhibits introduced in support thereof, and in rejecting the testimony of J. J. Mazourosky and the exhibits offered in support thereof."

In the plaintiff's case in chief there was no testimony to show the extent of his practice. The mere allegation in the complaint of a lucrative practice did not give counsel the right to introduce rebuttal testimony when there was none to rebut. The only purpose for making such an offer of proof would be to show plaintiff's reputation as affecting his credibility, or in mitigation of damages.

"A witness may be impeached by the party against whom he was called, by contradictory evidence, or by evidence that his general reputation for truth is bad; or that his moral character is such as to render him unworthy of belief, but not by evidence of particular wrongful acts; except that it may be shown by the examination of the witness or the record of the judgment that he has been convicted of a crime": Oregon Code 1930, § 9-1911.

The writer of this opinion knows of no way to legally prove a man's moral character except by showing his general reputation, "for as he thinketh in his heart so is he." Unfortunately there are no means known to the law, nor any of the other sciences, of finding out a man's thoughts, except as those thoughts are translated into words or deeds. Then the law says that what the people living in the same community and observing such words and action generally think of his moral character, is accepted as proof. The law makes one exception: The admission of the witness himself

or the record of the judgment that he has been convicted of a crime. All other particular acts are forbidden.

"Even where the rule is accepted that the bad character of the plaintiff may be shown in mitigation of damages, the defendant is not permitted to show particular acts of misconduct by the plaintiff not connected with the words for which recovery is sought": 17 R. C. L., § 214.

"In all criminal prosecutions for libel, the truth may be given in evidence, and if it shall appear that the matter charged as libelous is true and was published with good motives and justifiable ends, the defendant must be found not guilty": Oregon Code 1930, § 14-1021.

"This section changed the common law rule, that in criminal libel it was immaterial whether the matter charged as libelous was true or false, and under this section the truth may be given in defense and is a complete defense, if it further appears that the publication was under such circumstances as to justify the conclusion, that it was made with good motives": *State v. Putnam*, 53 Or. 266 (100 P. 2).

"An injurious publication is presumed to have been malicious if no justifiable end or good motive is shown for making it": Oregon Code 1930, § 14-1022; *State v. Mason*, 26 Or. 273 (38 P. 130 26 L. R. A. 779, 46 Am. St. Rep. 629).

Finding no error it follows that the judgment should be affirmed.

BEAN, C. J., concurs.

---

Petition for rehearing denied June 9, 1931
ON PETITION FOR REHEARING
(300 P. 350)

*Joseph, Haney & Veatch,* of Portland, for appellant.

*Frank J. Lonergan, Thomas G. Greene, John A. Collier, E. B. Seabrook, W. Lair Thompson, Nicholas Jaureguy,* and *J. O. Bailey,* all of Portland, for respondent.

*John W. Kaste,* of Portland, *amicus curiae.*

516

KELLY, J. In a petition for rehearing our attention is called to the fact that defendant requested an instruction similar to the one given by the court that in the assessment of damages consideration might be given by the jury to the effect of the publication upon the plaintiff's reputation and standing as a lawyer. In our original opinion, we held that the giving of this instruction constituted error. It is now argued that, if any error was committed by the court in that respect, it was invited error and not available as grounds of reversal.

The learned judge of the trial court did not refer to defendant's request when defendant excepted to the giving of this instruction; and the writer was governed by the thought that attention would have been called to the request for such instruction at that time if any such request had been made.

Whether this court should suffer a judgment for $35,000 to stand when based upon instructions as to law, which this court deems to be erroneous merely because such error was invited by counsel for the unsuccessful party, is a question not necessary in passing upon this motion for a rehearing.

Basically, the theory of pleading is that it is the means whereby the parties litigant make known to each other the facts upon which they rely and the nature of the relief sought. In the case at bar there is no allegation in the second amended complaint that the published article affected plaintiff in his capacity as a lawyer. There is no allegation that, as a lawyer, he lost any business because of it. On principle, this amended complaint is insufficient to support a recovery either upon the ground of injury to his standing as a lawyer or upon the ground of loss of business.

Plaintiff insists that the court should follow the doctrine of *Sanderson v. Caldwell,* 45 N. Y. 398 (6 Am. Dec. 105). In this connection, it is well to bear in mind that in this New York case, repeatedly insisted upon by plaintiff as the controlling precedent by which this court at all hazards must be governed, after averring that the plaintiff at the time of the publication complained of was a practicing lawyer and after setting out the libelous article, the complaint alleges:

"That said defendants in said libel referred to meant plaintiff in this action and did by such article charge and intend to charge the plaintiff with being in the habit of the use of spirituous liquors *to excess or to intoxication and to such a degree of intoxication as to disqualify him for the proper transaction of his professional business* and of impropriety, dishonesty, and fraudulently obtaining money of and from the soldiers and sailors of his district, the boys in blue; and did also in and by said libel charge and intend to charge the plaintiff with taking advantage of the soldiers and sailors *in his professional capacity as lawyer* and in making unfair, unreasonable, and extortinate charges against them for professional services and with compelling them to pay such charges."

The writer is of the opinion that in a case, where the defect appearing in the case at bar is not manifest in the pleadings, we can find no basis by which we may be guided even though statements unnecessary to the decision in such case appear therein.

The report of *Pattangall v. Mooers,* 113 Me. 412 (94 Atl. 561, L. R. A. 1918E, 14, Ann. Cas. 1917D, 689), does not specifically set forth the allegations of the complaint nor is the sufficiency of the complaint discussed, but the opening sentence of the opinion is as follows:

"This is an action for slander for certain oral statements by the defendant, alleged to be false and defama-

tory, and to have been made maliciously concerning the plaintiff, with intent to injure him in *his good name and reputation as an attorney at law, and likely to so injure him.*"

In *Williams v. Hicks,* 159 Wis. 90 (150 N. W. 183), it is said in the statement of the case by the court:

"Plaintiff was a lawyer in good standing, and it was claimed that the article in question was willfully and maliciously composed and *published with intent to injure him in his good name and fame as a lawyer* and to bring him into public contempt and ridicule."

The complaint contained allegations to the effect stated and also all the essential allegations to support a recovery.

In *Cyrowski v. Polish-American Publishing Co.,* 196 Mich. 648 (163 N. W. 58), we find this statement:

"The plaintiff claimed that he had become a leader among the Polish people and that he had established himself in a position of trust and confidence among them and as a result of the libelous attack his good reputation was destroyed, *which resulted in great pecuniary damages to him in the loss of business as a practicing attorney. This element of damage is particularly set forth in the declaration.*"

In *Krug v. Pitass,* 162 N. Y. 154 (56 N. E. 526, 76 Am. St. Rep. 317), the sufficiency of the complaint is not discussed.

In *Moore v. Francis,* 121 N. Y. 199 (23 N. E. 1127, 8 L. R. A. 214, 18 Am. St. Rep. 810), the sufficiency of the complaint is not discussed.

In *Kutcher v. Post Printing Co.,* 23 Wyo. 178 (147 P. 517, 149 P. 552), the question was whether the petition stated facts upon which damages could be awarded

because of the effect upon plaintiff in relation to his encumbency in the office of mayor. We quote the sixth paragraph of the petition:

"Sixth: That in and by said words and matter hereinabove quoted and set forth and so published by the defendants as aforesaid the said defendants, among other things intended to, and did accuse the said plaintiff of, and then and there and thereby intended to. convey, and did convey, to the readers of said newspaper, of and concerning the plaintiff and which was by said readers so understood, each and all of the following: (a) That the said plaintiff as such said mayor of the said city of Sheridan did unlawfully permit a dive, namely, a disorderly place, to be carried on and conducted in the said city of Sheridan in violation of the laws and ordinances governing the said city of Sheridan, by the said Maple Leaf Club: (b) That the said Maple Leaf Club owned and had in its possession, within the said city of Sheridan, gambling paraphernalia at the place where it conducted said club used by its members for the purpose of gambling, and that the said plaintiff as such said mayor wrongfully and unlawfully failed to perform a duty to confiscate said gambling paraphernalia: (c) That the said plaintiff as such said mayor of the said city of Sheridan did knowingly and unlawfully permit one Tooner, within the said city of Sheridan, to violate the laws and ordinances governing the said city of Sheridan, and that the said plaintiff as such said mayor did unlawfully and corruptly protect the said Tooner in the violation of the said laws and ordinance: (d) That the said plaintiff as such said mayor of the said city of Sheridan did unlawfully and knowingly and in violation of the laws and ordinances governing the said city of Sheridan, permit the said Tooner to sell liquor within the corporate limits of the said city of Sheridan on Sunday: (e) That the said plaintiff as such said mayor of said city of Sheridan did knowingly, unlawfully, and in violation of the laws, ordinances, and orders governing the said city of Sheridan, permit open violations of the

said liquor laws and ordinances prohibiting the sale of liquor within the said city: (f) That the said plaintiff has wholly failed to perform the duties of his office as such said mayor of the said city of Sheridan, was and is a corrupt official, was and is guilty of malfeasance in office as such said mayor, and has connived with and protected persons within the said city of Sheridan in the violations of the laws and ordinances of the said city of Sheridan.''

These are the cases relied upon to support plaintiff's claim that we erred in holding that the complaint in the case at bar should obtain an allegation that the libel affected him in his professional capacity. We will now review the cases cited by plaintiff in support of his contention that the instructions pertaining to alleged loss of business should have been given.

*Ben-Oliel v. Press Publishing Co.*, 251 N. Y. 250 (167 N. E. 432), merely holds that the complaint in that case was not subject to demurrer because special damages were not pleaded. The question of the necessity of pleading loss of business as an element of damage in order to warrant its submission to the jury is not mentioned, referred to or suggested.

*Secor v. Harris*, 18 Barb. (N. Y.) 425, holds that the alleged oral statement of defendant concerning plaintiff was actionable per se. No discussion is had with reference to the necessity of alleging loss of business in order to warrant the submission of the question of loss of business.

In *Brown v. Durham*, 42 S. W. 331, the question decided, which most nearly approaches the one we are discussing, was whether inasmuch as the plaintiff had alleged in his complaint: ''That plaintiff was a tie contractor and that the publication was made for the sole

purpose of injuring him in his character, reputation and business and credit in his dealings with the public, in his capacity of railroad contractor," it was error to refuse to give a requested instruction to the effect that in the absence of proof of actual injury only nominal damages should be awarded.

There is not one word about the necessity of pleading loss of business in order to warrant the submission to the jury of a claim therefor.

*Jenkins v. Taylor,* 4 S. W. (2d) 656, in so far as it pertains to the question under consideration here, holds that because the article therein shown to have been published was libelous per se the trial court erred in limiting the recoverable damages to injury supported by evidence of damage to plaintiff's reputation as a practicing attorney. The Court of Civil Appeals held that the plaintiff was entitled to damages to his reputation generally and also to his political career. Nothing is said about the necessity of alleging loss of business in order to recover for it.

The case of *Redfearn v. Thompson,* 10 Ga. App. 550 (73 S. E. 949) (cited in brief as *Redfern v. Thompson,* 73 S. W. 993), is an action for slander. No discussion appears in it of the necessity of alleging loss of business in order to recover therefor.

In the case of *Hess v. Gansz,* 90 Mo. App. 439, the complaint contained three causes of action: one for damages to plaintiff in his quality as a private individual, another to him as an attorney at law, and still another as public officer. The court held that there is a distinction between stating a single cause of action in different ways in separate counts, and in so dividing it as to make it the basis of three distinct causes of action and three recoveries. The court reversed it on

other grounds and suggested that before another trial plaintiff should amend his petition so that the material therein contained should be stated in separate counts but as one cause of action. There is no discussion of the necessity of pleading loss of business in order to recover damages for it.

In *Turner v. Hearst,* 115 Cal. 395 (47 P. 129), the Supreme Court held that proof of the extent of plaintiff's practice was admissible. No reference is made to the question of the necessity of pleading loss of business in order to recover damages for such loss.

In *Switzer v. Anthony,* 71 Colo. 291 (206 P. 391), plaintiff made no claim that the libel affected her business. The question under consideration here is not in the case.

In *Lewis v. Hayes,* 165 Cal. 527 (132 P. 1022, Ann. Cas. 1914D, 148), (cited in brief as *Lewis v. Lewis,*) the complaint charged in two counts: in the first, seeking compensation in the sum of $10,000 for general damages; in the second, seeking compensation in the sum of $20,000 for special damages alleged to have been occasioned to her by the injury to her lodging house business and to her business as an instructress in the art of dancing. The record discloses also that plaintiff testified that following the publication the income from her dancing pupils fell to $20 or $30 a month from $180 to $200 a month as it had been previously, and that following the publication of the article all her roomers save one left her house.

In *Scott v. Times-Mirror Co.,* 181 Cal. 345 (184 P. 672, 12 A. L. R. 1007), ''intent and design to injure, disgrace and defame this plaintiff and to bring him into public discredit as a lawyer and as a man'' is alleged and it is further alleged ''that by means thereof the

plaintiff has been and is injured in his reputation as aforesaid, and has also lost and been deprived of gains and profits, which would otherwise have arisen and accrued to him in his said business and profession.'' And it is further alleged that the publication was made ''by the defendant * * * with the intent, design and purpose on the part of said defendant to injure this plaintiff in his professional standing and reputation and to discredit and defame this plaintiff and to bring this plaintiff into discredit as an attorney at law.''

*Doyley v. Roberts,* 3 Bing. (N. C.) 825 (cited in brief as *Dorley v. Roberts*), is an action for slander. The plaintiff declared that he is an attorney and that the defendant had falsely spoken and published of the plaintiff, and of and concerning him in the way of his business or profession that he had defrauded his creditors and had been horsewhipped off the course at Doncaster. Special damage that one H. Gyde had, in consequence, declined to employ the plaintiff. The jury found that these words were not spoken of the plaintiff in his character of attorney. Judgment was arrested. Park, J., says: ''Here the jury have negatived the allegation that the words were spoken of the plaintiff in his professional capacity. That being the case, they are words of great abuse, but not so severe as many of the expressions which are pointed out in *Ayre v. Craven,* as having been held not actionable.'' Lord Denman, C. J., says: ''After full examination of the authorities, we think that in actions of this nature, the declaration ought not merely to state that such scandalous conduct was imputed to the plaintiff in his profession but also to set forth in what manner it was connected by the speaker with that profession.''

This case certainly does not hold that it is unnecessary to allege loss of business as an attorney in the

case of libel in order to recover damages therefor. As far as the writer is able to discern, this case is not in point on any question involved in the case at bar. It is not an action for libel wherein an entirely different rule applies as to that which is actionable per se from the rule applicable in actions for slander.

The writer has not at any time been oblivious to the fact that there are authorities at variance with his views upon the necessity of pleading that the libel injures plaintiff in his professional capacity in order to justify the submission of the effect of such libel upon the reputation and standing of plaintiff in that capacity.

The cases, however, cited in plaintiff's brief are cases where a holding contrary to the writer's views was unnecessary and hence dictum.

The writer construes the case of *Smedley v. Soule,* 125 Mich. 192 (84 N. W. 63), in a different manner from that in which plaintiff construes it. In that case the plaintiff was a practicing attorney who had rendered professional services for the city of Grand Haven at the instance of the mayor of that city. Upon the question of remuneration of plaintiff for his professional services, the council of that city were evenly divided and the mayor cast the deciding vote. The clerk of the city refused to issue a warrant for such fee. The plaintiff instituted mandamus proceedings in the circuit court to compel the issuance of such warrant. Plaintiff was unsuccessful in the circuit court, but prevailed in the supreme court (*Smedley v. Kirby,* 79 N. W. 187). Subsequently the question of bonding the city to pay certain of its indebtedness including plaintiff's bill was submitted to a vote of the electors. That submission took place before the decision on ap-

peal in *Smedley v. Kirby,* supra. The defendants issued a circular containing the following language: "Does any citizen believe that he (the mayor) did not have a 'divy' in the notorious fraudulent Smedley bill? * * * The notorious Smedley bill that the mayor has included in one of the items the people are asked by him to bond the city to pay. Don't have to be paid. Judge Padgham has taken care of that."

Plaintiff contends that the foregoing libel "did not touch plaintiff in his professional capacity and only libeled him as an individual." To charge a lawyer with trying to collect a fee for his professional services in behalf of the city under an arrangement to divide the same with the mayor of that city and to designate the same as notorious and fraudulent is in the opinion of the writer touching the attorney in his professional capacity. In effect the libel is that an extortionate charge was made by the attorney against his client, the city, under a corrupt and collusive agreement with the mayor.

■ The general rule is that the instructions given must conform to the issues raised by the pleadings and be based thereon: 13 Ency. of Plead. and Pract., p. 108, par. 3. Because it is said that the error, in giving the instructions as to the effect of the libel upon plaintiff as a lawyer, was invited, it should be understood that our conclusions herein with respect to the motion under consideration are not based upon the court's error in that regard.

■ The defendant did not request the court to instruct the jury that in assessing damages consideration should be given to loss of business. The court did, however, so instruct the jury and an exception was taken to such instruction. There is no allegation in the second

amended complaint and there is absolutely no testimony in the record that defendant lost any business because of the libel. On principle, then, in that respect, the case was not submitted to the jury on the record.

It is true that general damages were awarded in one sum and punitive damages in another; but this court is utterly unable to determine how much general damages were awarded because of loss of business.

As to the error in denying defendant the right to cross-examine plaintiff, the writer thinks that plaintiff gives an unjustifiably narrow and restricted construction to the direct examination.

The writer is of the opinion that the examination of plaintiff had a direct bearing upon the issue of actual malice; further, that the question that was being answered was: "Q. Under what circumstances did you learn that?" (That alleged statements forming the basis of the libel had been made to the reporter of the Telegram.)

It is true that plaintiff was interrupted by his attorney before the answer to his question was completed. Plaintiff said: "On Tuesday morning, October 2, I think is the date of the publication—" His attorney then said: "Q. That is the date, yes, October 2d." Then plaintiff continued: "A. About 7:30 in the morning or a quarter to 8 I was called on the telephone by Mr. Phillips—no, a man named Bailey who was a reporter for the Telegram, Seth Bailey, I think his name was."

Again the attorney speaks: "Q. He told you who he was over the 'phone did he? A. Yes, he told me who he was." Then: "Where were you at that time?" The plaintiff then testified: "A. I was shaving myself in the bathroom when this 'phone came, and he

said he was Seth Bailey from the Telegram and that he had a sensational story about me. I said, 'Is that so?' He said, 'Yes.' I said, 'What about it—what kind of a story have you got about me now?' He said, 'Well you—McDonald, or Knight, says that you betrayed him and gave away—informed on him, and said that you were his attorney; that you betrayed him professionally,' and he said, 'We are going to publish the story.' Well, the Telegram had been making a buffer of me for about a year before, and I was pretty mad about it, and I said, 'Now, I want to tell you one thing; you just stop publishing that story about me because it is entirely false,' and I said, 'If you publish it, I am going to sue you for libel,' and I told him, I said to him, 'I am coming down to see you right off,' so Mr. Neppach came along then in his car and we drove down to the Telegram office.''

How anyone with experience in the trial of law suits could torture the foregoing record into meaning that plaintiff was merely answering the question: ''Where were you at that time?'' is beyond the comprehension of the writer. Such a construction impugns the conduct of plaintiff and is a reflection upon the intelligence of all of the participants in the trial. In the opinion of the writer plaintiff was stating the circumstances under which he learned that statements of the kind published had been made to a reporter of the Telegram. That is what his attorney had asked him to do. Until the answer last hereinabove set forth had been completed, that is what plaintiff had not done. The answer was responsive to the question which apparently all parties understood that the witness was answering. In carefully reading and rereading this record, the writer is wholly unable to understand it otherwise.

· An interruption as to time, name of person, or any similar matter having for its purpose clarity of understanding of a question submitted certainly ought not to deprive a party of the right to fully and completely answer the question submitted.

In stating those circumstances plaintiff said that the Telegram had been making a buffer out of him for about a year or more and he was pretty mad about it. As the writer understands the English language, that was one of the circumstances related in response to the question, "Under what circumstances did you learn that?" The answer was responsive to the question and relevant to the issue of actual malice.

The case of *Upton v. Hume,* 24 Or. 420 (33 P. 810, 21 L. R. A. 493, 41 Am. St. Rep. 863), is cited as authority for the doctrine that actual malice may not be proven by statements or articles of a different import from the libel charged. This case holds that a subsequent article different from the one in suit can not be introduced in evidence. In the case at bar the testimony of plaintiff was concerning instances occurring prior to the publication, not subsequent thereto.

In the petition for rehearing plaintiff now contends that his testimony was incompetent. We have the anomalous situation of a plaintiff who for years had been a practicing lawyer testifying to circumstances tending to impute actual or express malice on defendant's part in support of a charge to that effect in his complaint, and who now contends that his testimony is incompetent. He did not move to have it stricken. The court did not strike it. The case was submitted to the jury and a large verdict was returned upon this testimony which defendant now characterizes as incompetent.

The writer prefers to think that the plaintiff was clearly within his legal rights when he so testified. The writer also thinks that the weight of authority as well as the better reasoning supports the rule that evidence that the libel in issue has been preceded by others from the same source, though disimilar in character, is admissible to prove malice: Newell, Slander and Libel, (4th Ed.) § 286, p. 232, and cases there cited; 37 C. J. 488, and cases there cited.

While it is true that upon cross-examination the plaintiff expressly testified that in using the term "buffer" he meant that "the Telegram had accused him of having corrupted one of the members of the supreme court falsely and maliciously and without any truth in it," and to this extent his testimony tends to prove the prior publication of articles of the kind indicated by plaintiff, yet it is also true that plaintiff further testified: "A. I had a case in the supreme court called the Wemme case and the lawyer who drew the will in the case didn't know how to draw it; the will was void, utterly void. That same lawyer had (a) charge of $32,000 for probating the estate, and he sold the property at the Burnside bridge for $47,000, and falsely represented to the court that he had obtained $100,000 for it, and in order to cover his own tracks, he tried to make me out a crook and the Telegram was his vehicle in doing it." He also testified that the late George W. Joseph was the lawyer to whom he referred. This in part is the meaning of the term "buffer" as the plaintiff defined it and as the plaintiff used it in his direct examination. In other words, the plaintiff testified that there was collusion between the defendant and Mr. Joseph because of Mr. Joseph's relation to the Wemme case and his alleged misconduct with

reference thereto to discredit plaintiff in order to divert attention from such alleged misconduct on Mr. Joseph's part.

Without reference to whether this alleged collusion manifested itself by other articles than the one in suit or not, the evidence of plaintiff concerning it had a direct bearing upon the charge of express malice. Being within the issues, the testimony was subject to a reasonable cross-examination. Mr. Joseph's conduct with respect to the Wemme case was clearly a matter about which defendant should have had the privilege of cross-examining plaintiff. On the contrary, defendant was not permitted to ask plaintiff if he had ever investigated the record of that administration, or if he knew what lawyer handled it, or if as a matter of fact a lawyer other than Mr. Joseph handled it entirely.

The writer is unwilling to ascribe to the plaintiff the course his brief now reflects with respect to the testimony we are considering. On the contrary he finds no irregularity or misconduct on plaintiff's part in testifying to those circumstances upon which he based the claim that defendant was actuated by actual malice. In that respect the testimony of plaintiff was competent, then cross-examination thereupon ought not to have been abridged.

For the reasons herein stated, the petition for rehearing is denied.

BELT and BROWN, JJ., concur.

BEAN, C. J., and CAMPBELL, J., dissent.

RAND and ROSSMAN, JJ., did not participate.