Argued April 4, affirmed June 21, 1973

COOK, *Respondent, v.* SAFEWAY STORES,
INC., ET AL, *Appellants.*
511 P2d 375

*John R. Faust, Jr.,* Portland, argued the cause for appellants. With him on the briefs were Cake, Hardy, Buttler, McEwen & Weiss, and Donald W. McEwen, Portland.

*James H. Spence,* Roseburg, argued the cause for respondent. With him on the brief were Washburn, Farrell & Spence, and Randolph Slocum, Roseburg.

HOLMAN, J.

Plaintiff brought a damage action for slander. Defendants appealed from a judgment for plaintiff entered pursuant to a jury verdict.

Plaintiff was an employe of the defendant Safeway Stores, Inc., at its Roseburg store. He was discharged from employment and shortly thereafter the defendant Coates, who was the manager of the Roseburg store, told three other Safeway employes that plaintiff was discharged because he had stolen from the company.

Defendants first contend that the court erred in allowing the following testimony over their objection:

"Q   What economic effect, what was your economic situation after your termination at Safeway?

"MR. McEWEN:   Just a minute. I am going to object. There is no allegation of special damage in the complaint, Your Honor, if that is the purpose of the question to elicit that information. There is no issue tendered by the pleadings.

"THE COURT:   What is the purpose of it?

"MR. SPENCE:   It comes within, Your Honor, a failure to work in the same employment that he had before, or in the same capacity that he had before, and this relates, of course, to general damages, as to what the economic impact of that was. I am not trying to establish any —

"THE COURT:   I will overrule that. You may go ahead.

"Q   (By Mr. Spence)   What was your financial situation after your termination at Safeway?

"A   (By the Witness)   It was rather tight, while I was at Drive 'N Save because of supporting the family and also because my pay check was considerably smaller since I was working five days at Drive 'N Save. Of course, when I left Roseburg and

went to Eugene, it was extremely tight because I was out of employment and was unable to find employment in Eugene. It was almost like living on a shoestring. I was paying child support and trying to get myself by also and, for a time, even on unemployment, tried to keep up the financial obligations of credit responsibilities but was unable to and my ex-wife's father advised that I should take out bankruptcy.

"MR. McEWEN: Well, Your Honor, that is certainly wholly inappropriate; it is not responsive to the question.

"THE COURT: It isn't responsive and I will sustain that objection.

"Q  (By Mr. Spence)  Did you take out bankruptcy?
"A  (By the Witness)  Yes, sir.

"Q  Now, you have already gone through the different kinds of employment you did obtain after being terminated at Safeway. What efforts, if any, did you make to find other kinds of employment?
"A  Well, naturally, I sought my line of work, the line of work I was well trained in, with almost every chain company in Eugene, plus some independents, also with other types of retail outlets, such as clothes and shoes.

"Q  You were not hired by any of those places?
"A  No, sir.

"Q  Did you seek any employment in other fields that you did not obtain?
"A  Yes, I did. I sought employment at the Coca Cola Bottling Company, truck driving. I do not recall the different types of fields but I do recall that I went out just about every week looking for employment somewhere, many times going back to the same places as I was told they would be needing somebody 'next week'.

"Q Did you try to obtain any work in life insurance?

"A Yes, I did, Equitable Life Insurance Society in Eugene. In fact, I was supposed to go with them. While I was still in Roseburg working for Drive 'N Save, I made several trips to Eugene and talked to Bob Decker, who was the district manager.

"Q Will you speak up a little louder so the jury can hear you?

"A I was supposed to go to work for Equitable Life while I was still working in Roseburg at Drive 'N Save and I had taken several tests for them; the week before I was supposed to go to Albany, I believe it was, to take my test for life insurance sales. I drove back to Eugene and told Mr. Decker what had happened with my termination with Safeway; I didn't want to hide anything; I felt that he should know. Consequently, I was turned down.

"MR. McEWEN: Well, just a minute. Your Honor, I object to this.

"THE COURT: That does sound like special damages and you haven't asked for any special damages. The action here is to recover for damage to reputation and not special damages.

"MR. SPENCE: That is all. Thank you.

"MR. McEWEN: Your Honor, I move that the last answer be stricken and the jury instructed to disregard it.

"THE COURT: All right, I will strike it. The jury will disregard it."

It should be noted that there was no objection upon the ground that plaintiff's economic situation was irrelevant or that there was no causal connection shown between the slanderous remarks and plaintiff's economic condition. The only objection was on the ground that the evidence offered was inadmissible because special damages had not been pleaded. Under

such an objection the sole determination required of this court is whether the evidence of the witness tending to show financial loss was admissible when no special damage had been pleaded.

In slander the plaintiff may recover only if special damages are specifically pleaded and proved, unless the words spoken fall within one of the categories which are actionable *per se*. If the words spoken impute the commission of a crime of major social disgrace, a loathsome disease, unchastity in a woman, unfitness to perform duties of office or employment for profit, or if they prejudice the plaintiff in his profession, then the words are actionable *per se* and a recovery of general damages may be made without proof of harm. *Woolley v. Hiner,* 164 Or 161, 100 P2d 608 (1940); *Reiman v. Pac. Devel. Society et al,* 132 Or 82, 284 P 575 (1930); McCormick, Damages 417, § 113 (Hornbook Series 1935). Even if the words spoken are actionable *per se,* special damages, to be recoverable, must still be specially pleaded. In the present case, the words spoken of plaintiff were actionable *per se* because they imputed not only the commission of a crime but that plaintiff was unfit to perform the duties of his employment.

Where the words spoken are actionable *per se,* as they were here, damages to reputation are presumed. Where the words have been spoken in relation to employment or business, the law presumes damage to employment or business reputation. However, a plaintiff does not have to rest on this presumption but may submit evidence of general damage to such reputation. The only testimony which tended to show financial loss, and thus the only testimony within the scope of defendants' objection to evidence of special damages,

was plaintiff's testimony concerning his inability to secure employment. Assuming causation (there was no objection on the basis of lack of causation),① the evidence of inability to secure employment would tend to show loss of earning capacity which would be part of plaintiff's general damage resulting from loss of reputation. The evidence of his inability to secure employment was of insufficient particularity to be a basis for a claim of special damages but this did not prevent its use when it had a tendency to prove plaintiff's loss of reputation as a competent employe.

The general rule is laid down in Newell, Slander and Libel 839, § 751 (4th ed 1924), as follows:

> "Where words are spoken of a person in the way of his profession or trade so as to be actionable in themselves, the plaintiff may allege and prove a general diminution of profits or decline of trade without naming particular customers or proving why they have ceased to deal with him. If the plaintiff desires to go into such details at the trial he may plead them specially, and call the customers named as witnesses. Still, if the customers are not called at the trial, or if for any other reason the proof of the special damage fails, the plaintiff may still fall back on the general damage and prove a loss of income induced by the slander. This he cannot do when the words are not actionable in themselves. But where the law already presumes that the plaintiff is injured in his business, so that the jury must give him some damages, evidence as to the nature and extent of plaintiff's business before and after publication is clearly admissible to enable the jury to fix the amount."

---

① There is authority to the effect that where the defamatory matter relates to one's employment, business or profession and is actionable *per se,* subsequent losses may be assumed to have been caused by the defamatory matter.

See, also, *Marr et al v. Putnam et al,* 196 Or 1, 28-29, 246 P2d 509 (1952), which holds that where defamatory words spoken of plaintiffs were actionable *per se,* evidence that telephone orders for their services ceased upon the publication of the defamatory article was proof of general damages.

■ The rule that defamatory words spoken of one in relation to his business activities are actionable *per se* is not limited to one engaged in business as an entrepreneur, but also includes words spoken of one in his employment. No distinction can be made between a businessman being permitted to testify concerning his subsequent loss of business and an employe being permitted to testify concerning his subsequent inability to secure employment.

In *Thomas v. Howard,* 168 A2d 908, 910 (DC Mun. App 1961), the court held that it was proper to admit testimony in support of general damages to the effect that plaintiff had been refused a job by a person who had heard that defendant had accused plaintiff of dishonesty. Most cases concerning defamation hold that it is error to admit evidence sufficient to prove special damages where special damages have not been pleaded. However, if the defamation is actionable *per se* and general damages are recoverable, even in the absence of a request for special damages, there is no logic in not admitting such evidence as proof of loss of earning capacity. Two cases have so held. *Young v. New Mexico Broadcasting Company,* 60 NM 475, 292 P2d 776, 778 (1956) ; *Julian v. American Business Consultants,* 131 NYS 2d 374 (Sup Ct 1954). Defendant's assignment of error is not well taken.

Defendant relies upon language from *Mannix v. The Portland Telegram,* 136 Or 474, 284 P 837, 297 P

350, 300 P 350 (1931). Mannix was a lawyer and the defendant published an article which was defamatory of him in his profession in that he had betrayed a client. The language upon which plaintiff relies was as follows:

> "'All charges of disreputable or criminal conduct tend to injure every man in his profession, trade, or occupation; but the law does not permit recovery therefor unless the words be spoken of him in regard to such profession, trade, or occupation, and loss is alleged and proved. Every such plaintiff can recover for injury to feelings and damage to his reputation. If he desires to go beyond this, it is a wholesome rule to require him to connect the libelous charge by the proper colloquium with such profession, trade, or occupation, and to allege special damages * * *.'" 136 Or at 488-89.

Prefatory to the above quotation the opinion states as follows:

> "A case, very similar to the one at bar, decided by the supreme court of Michigan, announces the law applicable *where there is neither pleading nor proof that plaintiff was damaged in his professional capacity or suffered loss of business* by reason of the publication in question. The Michigan court, speaking through Mr. Justice Grant, said:" (Emphasis added.) 136 Or at 488.

The validity of the application in *Mannix* of the quoted passage is suspect because Mannix alleged that he was a lawyer and that the betrayal of a client was viewed by the legal profession and everyone else with abhorrence. Be that as it may, if the quotation is presently good law, it has no application to this case because here plaintiff alleged that he had been injured in his reputation and good standing in the community and had been unable to obtain employment

in his profession or in any other profession requiring the same degree of responsibility.

■ Defendants' other assignment of error relates to the overruling of their objections to the receipt in evidence of a signed statement by a witness for plaintiff which was introduced in support of the witness's testimony. The witness had been an employe of Safeway at the time of the claimed slander and testified that the defendant Coates had called him and two other employes into the office and told them plaintiff had been stealing from the store, that plaintiff owed a gambling debt to a fat man, and that plaintiff's wife was pushing him for a fur coat. Upon cross-examination the witness was impeached by the introduction of two written statements taken from him. One of them stated that upon the occurrence in question the defendant Coates had said only that the plaintiff had let him down and that Coates had not said that the plaintiff had been stealing from the store. The other, which was more detailed, mentioned nothing about the gambling debt, the fat man, or plaintiff's wife pushing him for a fur coat. Subsequently, plaintiff introduced the document in question which was substantially in conformance with the witness's testimony at trial. The alleged slander was spoken in October of 1970. The signed statement in question, which was admitted in support of his testimony at trial, was taken in November of 1970. The two signed statements used for impeaching purposes were taken in June of 1971 and the trial was in June of 1972.

The defendants' contention is that where a witness is impeached by proving that he has made inconsistent out-of-court statements, it is not proper for purposes of rehabilitating him to prove that at other

times he has made out-of-court statements consistent with his testimony.

This court's most recent declaration on the subject was made in *Hale v. Smith,* 254 Or 300, 304, 460 P2d 351 (1969), in which we said after a discussion of our previous cases:

> "In view of this evolution of the rule in this state, we consider this to be an appropriate time to restate the rule.
>
> "We hold that when testimony of prior inconsistent statements has been introduced to impeach a witness and the witness denies making such prior inconsistent statements, the party calling the witness may offer testimony of prior consistent statements by the witness. It seems to us to be obvious that the prior consistent statements have relevancy upon the issue of whether or not the witness actually did make the alleged prior inconsistent statements. McCormick states the preferred rule to be: 'If the attacked witness denies the making of the inconsistent statement then the evidence of consistent statements near the time of the alleged inconsistent one, is relevant to fortify his denial.' McCormick, Evidence, 108 (1954) * * *."

It is defendants' contention that in the present case the exception to the rule of nonadmissibility mentioned in *Hale* is not applicable because in the present case the witness admitted rather than denied that he had made the prior inconsistent statement with which he was impeached. It was not our intention in *Hale* to lay down an all-encompassing rule which included all exceptions to the rule of nonadmissibility of such statements. The complete statement of the rule in McCormick, Evidence 106, § 49 (2d ed 1972), is as follows:

> "There is much division of opinion on the ques-

tion whether impeachment by inconsistent statements opens the door to support by proving consistent statements. A few courts hold generally that the support is permissible. This rule has the merit of easy application in the court room. Most courts, since the inconsistency remains despite all consistent statements, hold generally that it does not. But certain exceptions should be recognized. If the attacked witness denies the making of the inconsistent statement then some courts consider that the evidence of consistent statements near the time of the alleged inconsistent one, is relevant to fortify his denial. Again, if in the particular situation, the attack by inconsistent statement is accompanied by, or interpretable as, a charge of a plan or contrivance to give false testimony, then proof of a prior consistent statement *before* the plan or contrivance was formed, tends strongly to disprove that the testimony was the result of contrivance. Here all courts agree. It is for the judge to decide whether the impeachment amounts to a charge of contrivance,—ordinarily this is the most obvious implication—and it seems he is entitled to have an avowal one way or another from counsel. If it does not, then it may often amount to an imputation of inaccurate memory. If so the consistent statement made when the event was recent and memory fresh should be received in support. Recognition of these exceptions would leave it still open to these courts to exclude most statements procured after the inconsistent statement, and thus to discourage pressure on witnesses to furnish successive counter-statements." (Emphasis theirs.)

The only conclusion which could be drawn from defendants' attack on the credibility of plaintiff's witness was that defendants were contending either that the witness was giving recently contrived testimony or he had a failing memory, or both. In any event, we hold the introduction of the witness's prior consis-

tent statement to be proper. It tended to prove both that his testimony was not recently contrived and that at a time when his memory was fresh he remembered the occurrence in conformance with his testimony at trial.

The judgment of the trial court is affirmed.