Argued and submitted July 19, 1982, reversed and remanded April 27, respondent's
reconsideration allowed (63 Or 672, 667 P2d 532), former opinion modified June
29, petition for review denied October 4, 1983 (295 Or 730)

BENASSI,
*Respondent,*

*v.*

GEORGIA-PACIFIC,
*Appellant.*

(A7910-04736; CA A21694)

662 P2d 760

Clifford N. Carlsen, Jr., Portland, argued the cause appellant. With him on the briefs were James N. Westwood, and Miller, Nash, Yerke, Wiener & Hager, Portland.

William K. Shepherd, Portland, argued the cause for respondent. With him on the brief were David W. Heynderickx, and Shepherd & Heynderickx, Portland.

Before Buttler, Presiding Judge, and Warren and Rossman, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

Defendant appeals from a judgment awarding plaintiff, a former employe, damages for defamatory statements made by defendant to other of its employes regarding the circumstances of plaintiff's discharge. Defendant contends that there was insufficient evidence to overcome its qualified privilege, that plaintiff did not prove the requisite causation between the defamatory statements and his alleged damages, and that an erroneous jury instruction was given.

We view the facts in the light most favorable to plaintiff, the prevailing party. *See Green v. Uncle Don's Mobile City,* 279 Or 425, 568 P2d 1375 (1977). Defendant is a large forest products company with headquarters in Portland at the time here involved. Its operation is organized into divisions, one of which is the machinery construction division, headed by M. Fred Wall, who was also defendant's Director of Purchasing. Plaintiff was hired by Wall as general manager of the division in August, 1977.

Defendant planned to expand its machinery construction division into the southeastern United States, and a business trip was undertaken to Hattiesburg, Mississippi, in July, 1978, by plaintiff, Elmer Arndt, who had been hired as an independent consultant, Richard Galligher and others. While in Hattiesburg an incident occurred at the group's motel in which plaintiff confronted Arndt regarding a telephone call Arndt had made earlier in the evening to Wall. There was testimony, which plaintiff does not dispute, that he used a loud voice and considerable profanity. Plaintiff, Galligher and Arndt had been drinking prior to the incident, although plaintiff states he was "in control of all [his] faculties."

The incident was reported to Wall after the group returned to Oregon, and he called plaintiff into his office, reprimanded him and informed him that he would be terminated immediately if a similar incident occurred again. Plaintiff informed Wall that the incident would not have occurred if liquor had not been involved.

The following May, plaintiff took another business trip to Hattiesburg with a group of defendant's employes.

On May 16, following a dinner at which plaintiff consumed wine, he and Galligher went to a cocktail lounge for a "nightcap." While there plaintiff and Galligher discussed a wage dispute brewing at the plant with Richard Miller, an employe of the plant, who was seated farther down the bar; the discussion became heated. Miller was not plaintiff's direct subordinate, but during the argument plaintiff told him that he was fired; his voice was loud and his language was profane. The next morning plaintiff and Miller's plant supervisor agreed that Miller was not fired, and plaintiff and Miller agreed that the incident would not have occurred if liquor had not been involved. Galligher was described by plaintiff as "quite intoxicated." Miller admitted to drinking too much. Plaintiff testified that he was not drunk and was "certainly the most sober" of the participants.

About May 25, Wall received an anonymous letter from Hattiesburg describing that incident. The letter stated that the men were "drunk," that there was an argument between plaintiff and Miller in which plaintiff used profane, loud and nasty language, and that plaintiff made a lot of "nasty" remarks about Wall. Wall phoned Miller and Galligher (and two others who informed him that they did not observe the incident) for confirmation, asking specifically what names he was called. Miller informed Wall that he (Miller) had been drinking, that plaintiff had not called Wall any names and that Galligher was in the worst condition of the three. Neither Miller nor Galligher characterized plaintiff as being drunk. Based on those conversations, and without talking to plaintiff, Wall decided to fire him; he had been "90% sure" he would do so after reading the anonymous letter. Plaintiff sought reinstatement, but admitted that Wall had the right to discharge him.

News of plaintiff's termination began circulating among machinery construction division employes the following weekend, and rumors, including one that the division was going to close, were circulating as well. Morris Rivers, who succeeded plaintiff as general manager of the division, called a general meeting of the employes on June 1 to explain plaintiff's termination, to reassure them and to acquaint them with him. The meeting was attended by

most of the 120 employes of the division. Rivers introduced himself, gave some background information on himself and said that he believed it was important to have a candid relationship with division employes. He then made the following statement, which is the subject of plaintiff's defamation claim:

"I gathered you all here to tell you why Mr. Benassi is no longer with the company. The man was drunk and misbehaving in a bar. The man had a drinking problem. Georgia-Pacific looks unkindly on this kind of conduct. It was not the first time. He had been warned."

Following his discharge, plaintiff began looking for another job, but had difficulty securing employment. Two job recruiters assisted him, and he contacted some prospective employers himself in response to advertisements, but he received no job offers for approximately five months. Finally, he was hired by an employer referred by the second job recruiter for a position paying approximately $32,000 per year. He had been earning approximately $37,500 per year from defendant at the time of his discharge. He contends that his inability to secure a position that paid as well as his former job with defendant was caused by the defamatory statement.

In response to the defamation claim, defendant raised two affirmative defenses: truth and privilege. The trial court ruled that defendant had a qualified privilege to make the statement, but left to the jury whether the statement was true or whether the privilege was lost through abuse. The jury returned a general verdict awarding plaintiff $350,000 damages.

In its first assignment, defendant contends that the trial court erred in denying its motion for a directed verdict on the ground that there was insufficient evidence that defendant abused its qualified privilege. Defendant concedes here that whether the statement was true was a jury question.

■    A qualified, or conditional, privilege to make a defamatory statement arises, among other occasions, when it is made to protect the interests of the plaintiff's employer or it is on a subject of mutual concern to the defendant and those to whom it is made. *Wattenburg v. United Medical*

*Lab.,* 269 Or 377, 380, 525 P2d 113 (1974). The trial court ruled that defendant had established a qualified privilege, and that ruling is not challenged. The privilege is lost, however, and the publisher is liable, if he abuses the occasion which gave rise to the privilege. *Schafroth v. Baker,* 276 Or 39, 45, 553 P2d 1046 (1976); Restatement (Second) Torts, § 599 (1965). In *Schafroth,* the court stated that an occasion may be abused in the following four ways:

> " "* * * The occasion may be abused because of the publisher's lack of belief or reasonable grounds for belief in the truth of the defamatory matter (see §§ 600-602); because the defamatory matter is published for some purpose other than that for which the particular privilege is given (see § 603); because the publication is made to some person not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege (see § 604); or because the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged (see § 605).' " 276 Or at 45 quoting Restatement of Torts, § 599, comment a at 264 (1938).

■ Plaintiff contends that there was evidence from which a jury could find that defendant lacked reasonable grounds for belief in the truth of the defamatory matter. We agree. The only "evidence" that plaintiff was drunk at the second incident came from an anonymous letter, but Wall made no attempt to determine who was its author. The employes with whom Wall checked, whom the evidence indicates he trusted, directly contradicted the allegation in the letter that plaintiff said unpleasant things about Wall. A jury could reasonably infer that, given the falsity of that information, a reasonable person would have questioned the accuracy of other statements in the letter. Neither Miller nor Galligher characterized plaintiff as drunk. Moreover, other evidence indicates that Wall had little or no interest in hearing plaintiff's explanation of the incident. In short, in informing its employes that plaintiff was discharged because he was drunk in a bar, defendant chose to rely on an anonymous letter in believing the most unfavorable characterization of plaintiff's condition and conduct, despite contrary evidence from its own officers. A jury could determine that it was unreasonable to do so.

Moreover, we think that a jury could determine that it was unnecessary for Rivers to tell essentially every employe in the machinery construction division that plaintiff was "drunk and misbehaving," that he had a "drinking problem" and that any belief that Rivers may have had as to the necessity of doing so was unreasonable. Although, as the trial court ruled, an employer is privileged to disseminate to its employes a certain amount of information regarding the discharge of another employe in order to protect its interests, Restatement of Torts, §§ 604 and 605, indicate that the amount of defamatory material that it is privileged to publish may depend on the position of the employes to whom the information is given. For example, it may be necessary for the official who makes the decision to terminate to make a full disclosure of all defamatory material to his immediate supervisor, while a simple statement to assembly line workers that a vice president was terminated because of a dispute with higher management over the conduct of his job may be sufficient to protect the legitimate interests of the employer.

Here, Rivers had called a meeting of the supervisory staff prior to the objectionable speech and told them the purported reasons for plaintiff's discharge. The approximately 120 employes gathered for the offending speech, however, included employes two levels below plaintiff. Some of the "rank-and-file" testified that they thought it "strange" that they were informed as to the reasons for plaintiff's discharge, and a supervisor testified that he did not think that it would have caused problems for him if the employes working for him had not been told the reasons. An accountant at the plant testified:

"I think it would have sufficed to say that there was disagreements between hiring management and Mr. Benassi rather than saying exactly what the problem was, being a personal problem."

We conclude that the question of abuse of the privilege was for the jury.

In its second assignment, defendant contends that the trial court erred in denying its motion for a directed verdict as to plaintiff's claims for lost earnings on the ground that there was no evidence that his difficulties in obtaining employment were caused by the defamatory

statement. Plaintiff alleged three types of damage caused by the defamatory statements: (1) He was "prevented from securing employment from the time of his discharge until November 5, 1979, all to his damage in the amount of $16,146." (2) The defamatory statements injured him "in his good name, reputation and credit as an executive-level business manager, and it has cast and will cast a strong stigma on his standing as such, and has deterred and will greatly deter his finding employment at as large a salary as he had been able to secure prior to the publication of said slander, all to his damage in the sum of $500,000." (3) He "suffered damage by reason of injury to his good name, reputation, credit and standing in the community in which he resides, and he was publicly humiliated, embarrassed and shocked, and suffered extreme mental anguish and distress, all to his damage in the sum of $500,000." Defendant's motion was directed at the first and second allegations.

When a slander ascribes to the defamed party characteristics or conduct that would adversely affect his fitness for his occupation or profession, the slander is actionable *per se,* and the plaintiff need not allege or prove any special damage. Defendant concedes that River's speech could be found to be actionable *per se.* In such a case, *general damages,* which include damage to business reputation, Restatement (Second) Torts § 621, are presumed and may be recovered without evidence of the harm incurred, *Woolley v. Hiner,* 164 Or 161, 100 P2d 608 (1940); Restatement (Second) Torts §§ 570, 573 (1965). Loss of earning capacity is a part of the damage to business reputation, and evidence of inability to secure employment caused by the defamation is admissible to show that loss. *Cook v. Safeway Stores, Inc.,* 266 Or 77, 83, 511 P2d 375 (1973). Even where the slander is actionable *per se,* however, the plaintiff may recover for *special harm* if it is alleged and if the plaintiff proves that it is legally caused by the defamatory statement, *i.e.,* if the statement was a "substantial factor" in causing the harm. Restatement (Second) Torts §§ 622-622A. The inability to obtain employment that the plaintiff would have obtained but for the currency of the slander is special harm. Restatement (Second) Torts, § 575, comment b at 198.

■ Plaintiff's first allegation of damage clearly alleges special harm, and the question is whether there was evidence that River's speech was a substantial factor in causing that harm. His second allegation, however, alleges, for the most part, and in some detail, loss of earning capacity which, under *Cook* and *Wooley,* is an element of general damage and is therefore presumed. Although not required to do so, plaintiff submitted expert testimony on his lost earning capacity, which defendant contends was deficient for lack of proof of causation.[1] That contention, however, goes to whether that evidence should have been admitted,[2] not to whether the second allegation of damages should have been withdrawn from the jury. In any event, plaintiff's third allegation of damage clearly related to general damages, and after the parties had rested, the second and third allegations were consolidated into one expanded allegation of general damage.[3] There was no error in submitting that allegation.

■ However, plaintiff's first allegation (claiming special damages) should not have been submitted. The strongest evidence as to plaintiff's difficulty in finding a new job consisted of the testimony of two job placement recruiters and a log plaintiff kept of his employment search. Plaintiff volunteered to the first recruiter that he had been released

---

[1] Regarding lost future earnings, an economist testified that plaintiff would incur a total loss, discounted to present value, of "just over $200,000," based on two assumptions: (1) that the difference in pay between his current job and his job with defendant was caused by the defamatory statement and (2) that that differential would be perpetuated throughout plaintiff's working lifetime. Whether there was a sufficient foundation to permit that witness to make the first assumption depends on whether the defamatory statement was the cause of plaintiff's inability to secure a job that paid as well as his job with defendant.

[2] Defendant has not assigned error to the admission of this evidence.

[3] The consolidated allegation, as submitted to the jury, was:

"XIX

"By reason of said false, malicious and untrue statements of defendant, the plaintiff suffered damage and has been injured in his good name, reputation, credit and standing in the community in which he resides and as an executive-level business manager, and it has and will cast a strong stigma on his standing as such, and has deterred and will greatly deter his finding employment at as substantial a salary as he had been able to enjoy prior to the publication of said defamatory matter, and he was publicly humiliated, embarrassed and shocked, and suffered extreme mental anguish and distress, all to his damage in the sum of $1,000,000.00."

by defendant because someone had written an anonymous letter falsely accusing him of being drunk and disorderly in a public place. That recruiter told him that that information would diminish his attractiveness to prospective employers, but referred plaintiff to two prospective employers. Plaintiff was overqualified for one position, and an opening did not materialize in the other case. The recruiter did not inform those prospective employers of the stated reason for plaintiff's discharge, but advised them that "there were some extenuating circumstances that hadn't been cleared up as yet."

Plaintiff testified that, because of that experience and because another recruiter had informed him that it would be more difficult to secure a job if the details of his discharge were known, he gave a "sanitized version" of his termination to a third recruiter: that his superior disapproved of his handling a wage problem.[4] That recruiter was aware neither of defendant's reason for discharging plaintiff nor of River's speech. The first employer to whom the recruiter submitted plaintiff's application hired him at a salary of $32,000 per year. Plaintiff's log showed a list of companies he had contacted, some of which were in other parts of the country.

Defendant contends that that evidence does not show that the defamatory statement was the cause either of plaintiff's inability to secure any job for five months or of his inability to secure a job that paid as well as his job with defendant. It contends that any difficulties the first recruiter may have had in finding plaintiff a job stemmed from plaintiff's own republication of the defamation or from the mere fact that plaintiff was fired by defendant, for whatever reasons. The fact that the recruiter who found plaintiff a job was unaware of the defamatory statement, defendant contends, shows that the lower salary was not caused by the defamatory statement.[5] With respect to

---

[4] Although that explanation may appear misleading, the scene in the cocktail lounge with Miller did occur in the course of arguing over a wage dispute.

[5] Considering that there was no evidence that plaintiff's present employer was aware of the slander, plaintiff's argument presumably is not that, but for the currency of the slander, that employer would have offered him a higher salary but rather that, but for the currency of the slander, plaintiff would have been able to secure employment that paid as well as his old job sometime within the five months that he was unemployed.

plaintiff's claim for special damages for lost wages for five months, his first hurdle is to adduce evidence that the delay in obtaining a new job was caused by defendant's defamation of him. We agree with defendant that there was no direct evidence of such causation.[6] Plaintiff contends, however, that direct evidence is unnecessary and that the jury should be permitted to infer that River's speech accounted for his difficulty in obtaining comparable employment, relying on two Oregon cases.

In *Marr et al. v. Putnam et al.*, 196 Or 1, 246 P2d 509 (1952), the plaintiffs, who operated a radio repair business that solicited business by advertising in defendant's newspaper, sought damages for a defamatory newspaper article stating that repairmen who did business in that manner were "slickers" and introduced evidence that after the publication they received no further business. There, the libel was published to the group of persons from whom plaintiff solicited business, and the court stated that the jury could find that the decline in business was the consequence of the libel, not a mere coincidence. In *Stevens v. Wilber*, 136 Or 599, 300 P 329 (1931), the plaintiff was slandered in her place of business in the presence of customers; she testified as to the amount by which business diminished thereafter. The court stated:

> "* * * The jury had a right to take into consideration the element of the lessened receipts of the business following the utterance of the slanderous words. Cross-examination or other testimony might develop the fact that there were other reasons for the diminished returns shown by the testimony." 136 Or at 604.

In each of those cases, there was direct evidence that the publication was made to customers or prospective customers of a going business, and the court held that the evidence was sufficient to permit the jury to infer that the

---

[6] Plaintiff does not contend that there was any direct evidence that any of the employers he contacted were aware of the defamatory statements. Rather, he argues that causation was proved by the fact that "he had to modify extensively his job search method because of the circumstances of his firing," because he did not know how far "the bad word had spread." He further explained that, but for his having been fired, he would have contacted other people in the forest products industry, but stated, "I wouldn't dare have done that under these circumstances." As defendant contends, however, that problem relates to the fact that he was fired rather than to the defamatory statement.

defamation caused the diminished earnings. Here, however, plaintiff was an employe whose income stopped because he was terminated, not because he was slandered. He was not the proprietor an ongoing business whose receipts fell off after publication to its customers of a defamatory statement.

We conclude that it would be mere speculation to permit the jury to infer that plaintiff was unable to obtain a new job for five months because of the defamation. For that reason, the trial court erred in denying defendant's motion for a directed verdict on plaintiff's claim for special damages in the amount of $16,146. We cannot say with reasonable certainty that submitting the claim for special damages to the jury had no effect on the jury's evaluation of the evidence on liability or on the extent of plaintiff's general damages. Therefore, the case must be reversed and remanded for a new trial. *Maxwell v. Port. Terminal RR. Co.*, 253 Or 573, 577, 456 P2d 484 (1969).

■ Because the question raised by defendant's third assignment of error is likely to arise on retrial, we consider it. Defendant contends that, even if the question of abuse of the qualified privilege was for the jury, the trial court incorrectly instructed the jury regarding loss of the privilege. The instructions relating to loss of the privilege were:

"Now, when do we have a qualified privilege? And when may it be forfeited? All right, a qualified privilege may be forfeited if it is abused for any one of the four following purposes: (1) a qualified privilege may be forfeited if the Defendants lacked belief or had no reasonable ground for belief in the truth of the complained of statements; (2) a qualified privilege may be forfeited if the complained of statement was published for some purpose other than that for which the particular privilege is given; (3) a qualified privilege may be forfeited if the complained of statement is made to some person not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege; (4) a qualified privilege may be forfeited if the complained of statement included defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the particular privilege is given.

"The Defendant is required to act as a reasonable man under the circumstances with due regard to the strength of

his belief, the grounds that he has to support it and the importance of conveying the information. If the Defendant acts unreasonably under the circumstances, any qualified privilege is abused and therefore forfeit."

The first paragraph of the instruction lists by number the ways by which the privilege can be lost, is directly from *Schafroth,* and is correct. The first sentence of the second paragraph is directly from Prosser, Torts 796, § 115 (4th ed 1971) and is quoted with approval in *Walsh v. Consolidated Freightways,* 278 Or 347, 356, 563 P2d 1205 (1977). Defendant contends, nevertheless, that that sentence is redundant, and, although probably not prejudicial in itself, the last sentence is. Defendant argues that from that sentence the jury could have believed, incorrectly, that, in addition to the four ways set out in the first paragraph, there was a fifth, more general way by which a qualified privilege could be lost by defendant, namely, by "acting unreasonably" generally. We agree that the last sentence of the instruction could reasonably be so understood and, therefore, should not have been given.

Reversed and remanded.